

**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE AUG 1 5 2013

~~Madsen, C.J.~~
CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on Aug 15, 2013

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| JOSEPH LEMIRE, | NO. 87703-3 |
| Respondent, | |
| v. | |
| STATE OF WASHINGTON, DEPARTMENT OF ECOLOGY; and THE POLLUTION CONTROL HEARINGS BOARD, | EN BANC |
| Appellants. | Filed AUG 1 5 2013 |

STEPHENS, J.—The Department of Ecology (Ecology) is charged with protecting our state waters from actual or potential contamination under the water pollution control act (WPCA), chapter 90.48 RCW. In this review of an administrative order, we are tasked with determining whether Ecology has acted within its statutory authority. Ecology issued an administrative order to a cattle rancher, Joseph Lemire, directing him to take several steps to curb pollution of a creek that runs through his property. Lemire challenged the order, which was upheld on summary judgment by the Pollution Control Hearings Board (Board). Lemire filed an administrative appeal in Columbia County Superior Court. The

trial court reversed the summary judgment determination and invalidated the agency order as unsupported by substantial evidence. The trial court also concluded that the order constituted a taking. We reverse the trial court on all counts, reinstate the Board's summary judgment order and the underlying agency order, and hold that Lemire failed to establish a taking occurred.

## FACTS AND PROCEDURAL HISTORY

Joseph Lemire runs a small cattle operation in Columbia County. Pataha Creek runs through his grazing land. The creek is on a state list of polluted water bodies. In 2003, Ecology and the Columbia Conservation District performed a watershed evaluation in Columbia County, which identified Lemire's ranch as having conditions detrimental to water quality. From 2003 to 2008, Ecology made four visits to Lemire's property. On those visits it documented a number of conditions that it believed could contribute to the pollution in Pataha Creek. In 2009, it made visits to the property in March, April, and May, where it observed the same conditions. Beginning in 2003, Ecology attempted to work with Lemire to implement management practices that would curb pollution into the creek, with little success.[1] Following its 2009 observations, Ecology issued administrative order 7178. The order prescribed a number of corrective actions for Lemire,

---

[1] Contrary to the dissent's unsupported assertion that Ecology spent "six years trying to make a case against Lemire," dissent at 5 n.5, the record shows that Ecology spent six years attempting to work with Lemire in order to remedy the conditions on his property *without* resorting to issuing an order. *See, e.g.*, Admin. Order No. 7178, at 2 ("Since 2003, Ecology has made five attempts to provide Mr. Lemire technical and financial assistance to remedy the identified pollution problems. The local conservation district has also offered technical and financial assistance.").

including constructing livestock fencing and off-stream water facilities in order to eliminate livestock access to the stream corridor.

Lemire challenged the order before the Board. Ecology moved for summary judgment, which the Board granted, concluding there were no genuine issues of material fact in dispute. Lemire then brought an administrative appeal before the Columbia County Superior Court. After reviewing the administrative record, the trial court reversed the summary judgment determination and invalidated the agency order, holding the order was unsubstantiated by the record, and effected an unconstitutional taking. Ecology appealed, and Division Three of the Court of Appeals certified the case directly to this court.

## ANALYSIS

Washington's WPCA is designed to "insure the purity of all waters of the state." RCW 90.48.010. Ecology is charged with implementing the pollution-prevention purpose of the WPCA. In order to effectuate this purpose, Ecology is vested with the authority to issue orders for violations of the WPCA and for activities that create a substantial potential to violate the WPCA. RCW 90.48.120(1).

We are asked to consider the propriety of an agency order requiring Lemire to come into compliance with the WPCA. Lemire challenges the agency action on both statutory and constitutional grounds. We will turn first to his statutory arguments.

A. The Board properly upheld Ecology's order on summary judgment

In an appeal under the Administrative Procedure Act (APA), chapter 34.05 RCW, the appellate court sits in the same position as the superior court, reviewing the administrative record directly rather than the superior court record. *Griffith v. Emp't Sec. Dep't*, 163 Wn. App. 1, 6, 259 P.3d 1111 (2011). In an appeal from an administrative action, as elsewhere, "[s]ummary judgment is appropriate only where the undisputed facts entitle the moving party to judgment as a matter of law." *Verizon Nw., Inc. v. Emp't Sec. Dep't*, 164 Wn.2d 909, 916, 194 P.3d 255 (2008). The facts in the administrative record are viewed in the light most favorable to the nonmoving party, and conclusions of law are reviewed de novo. *Id.*

Here, the Board granted summary judgment in favor of Ecology when it determined there were "no materially disputed facts about the potential for discharge of organic material to state waters in violation of the statute." Administrative Record (AR) 12, at 12 (Order Granting Mot. to Dismiss and Mot. for Summ. J.).

The trial court reversed the Board, reasoning that summary judgment was not appropriate because substantial evidence did not support the agency's underlying order. Having reversed the Board's order, the trial court went a step further and invalidated Ecology's underlying order. Lemire argues this court should uphold that determination. He argues that the agency order is invalid because it is not supported by substantial evidence and because Ecology lacks the

authority to regulate nonpoint source pollution.[2] The party asserting the invalidity of the order carries the burden of proof. RCW 34.05.570(1)(a).

*1. Substantial evidence supports Ecology's order*

An agency's final decision may be invalidated by a superior court if the order is not supported by substantial evidence when the record is viewed as a whole. RCW 34.05.570(3)(e). The trial court appeared to rely on this provision, explaining that there was a "modicum of evidence" substantiating Ecology's order. Clerk's Papers (CP) at 191.[3]

Ecology is authorized to issue orders remedying not only actual violations of the state WPCA, but also those activities that have a substantial potential to violate

---

[2] The APA allows a court to grant relief from an agency's order only in the following circumstances:

    (a) The order, or the statute or rule on which the order is based, is in violation of constitutional provisions on its face or as applied;

    (b) The order is outside the statutory authority or jurisdiction of the agency conferred by any provision of law;

    (c) The agency has engaged in unlawful procedure or decision-making process, or has failed to follow a prescribed procedure;

    (d) The agency has erroneously interpreted or applied the law;

    (e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court . . .;

    (f) The agency has not decided all issues requiring resolution by the agency;

    (g) A motion for disqualification . . . was made and was improperly denied or [should have been made];

    (h) The order is inconsistent with a rule of the agency unless the agency explains the inconsistency by stating facts and reasons to demonstrate a rational basis for inconsistency; or

    (i) The order is arbitrary or capricious.

RCW 34.05.570(3).

[3] The trial court also determined that that the order constituted a per se taking of Lemire's land. CP at 191. This determination is addressed below.

the WPCA. RCW 90.48.120. Activities that violate or have the substantial potential to violate the WPCA are discussed in RCW 90.48.080:

> *It shall be unlawful for any person* to throw, drain, run, or otherwise discharge into any of the waters of this state, or *to cause, permit or suffer to be thrown, run, drained, allowed to seep or otherwise discharged into such waters any organic or inorganic matter that shall* cause or *tend to cause pollution of such waters* according to the determination of the department, as provided for in this chapter.

(Emphasis added.) Pollution is broadly defined as

> such contamination, or other alteration of the physical, chemical or biological properties, of any waters of the state, including change in temperature, taste, color, turbidity, or odor of the waters, or such discharge of any liquid, gaseous, solid, radioactive, or other substance into any waters of the state as will or is likely to create a nuisance or render such waters harmful, detrimental or injurious to the public health, safety or welfare, or to domestic, commercial, industrial, agricultural, recreational, or other legitimate beneficial uses, or to livestock, wild animals, birds, fish or other aquatic life.

RCW 90.48.020.

Hence, substantial evidence will support Ecology's order if the evidence shows that conditions on Lemire's ranch have substantial potential to violate prohibitions against discharging into state waters organic material that pollutes or tends to cause pollution.

The evidence Ecology presented at the administrative hearing before the Board showed that Ecology visited Lemire's property in February 2003, February 2005, February 2006, and March 2008. In 2009, Ecology visited the Lemire property on March 12, March 25, April 3, and May 4. Decl. of Chad Atkins at 3. Over the course of these visits, the following conditions were observed at the Lemire property around the creek: livestock with direct access to the creek,

overgrazing of the riparian corridor, manure in the stream corridor, inadequate "woody" vegetation, bare ground, erosion, cattle trails across the creek, trampled stream banks, and cattle "wallowing" in the creek. *Id.* at 3-4.

Ecology's expert, Chad Atkins, described via declaration how these conditions tend to cause pollution. Livestock defecation both in and adjacent to the stream results in the presence of fecal coliform and other pathogenic contamination in the water. *Id.* at 4. These pathogens have been linked to outbreaks and epidemics of disease in humans, including salmonellosis, leptospirosis, anthrax, and brucellosis. In addition, fecal coliform in the water affects not only the health of humans who come in contact with the contaminated water, but also the health of the water body itself; the pathogen depletes oxygen in the water, harming fish and other aquatic life and affecting the pH balance of the water. *Id.* at 5.

In addition, uncontrolled movement of cattle across and around the stream bed compromises riparian vegetation, which, along with hoof pressure from the livestock, makes the stream banks unstable and causes erosion into the stream bed. *Id.* at 6. The lack of vegetation eases the introduction of fecal matter into the stream. The erosion in turn introduces sediment that changes the shape and course of the stream, making it shallower and more susceptible to solar heating and raised temperatures. *Id.* at 6, 8. As noted above, the increased temperatures have a significant negative impact on aquatic life. The erosion, like the introduction of livestock waste material into the stream, also changes the pH of the stream and

impacts the measure of dissolved oxygen in a stream, which can negatively impact the stream's aquatic life. *Id.* at 7-8.

Atkins's declaration explains that Pataha Creek is listed on the State's water quality assessment, a report that is required by the federal Clean Water Act (CWA). *Id.* at 2. The report describes the current conditions of the State's waters to the United States Congress and the public. *Id.* The assessment report lists Pataha Creek as exceeding water quality standards for fecal coliform bacteria, pH, temperature, and dissolved oxygen. *Id.* The creek is a polluted water body. *Id.*

In sum, then, Atkins's declaration states that Pataha Creek is presently polluted due to its levels of fecal coliform, pH, temperature, and dissolved oxygen content. He did not conduct the tests confirming this pollution, but his declaration explains that the data evincing pollution was gathered as part of a federally mandated report that describes the current conditions of the creek. Atkins's declaration further explains that the pollution of the creek is consistent with what one would expect from the conditions at the Lemire property.

Lemire disputes some of Atkins's observations. He claims that the banks of Pataha Creek are naturally sparsely vegetated, and the denudation Atkins observed was not caused by the activities of Lemire's cattle. AR 9, at 2 (Decl. of Joseph "Joe" Lemire). Lemire challenges Atkins's suggestion that the cattle wallow in the stream but concedes the animals drink from the stream and cross the creek at times. *Id.* at 4-5. Lemire also disputes the suggestion that the diseases associated with fecal matter in the creek should be of concern, relying on information he received

from veterinarians at a clinic in Lewiston, Idaho. *Id.* at 7. Before the trial court, Lemire's briefing disputed Atkins's observation that there were large amounts of manure adjacent to the stream. CP at 73.

We acknowledge Lemire's challenges to Atkins's observations, but substantial evidence nonetheless supports Ecology's order. And, reviewing the record in the light most favorable to Lemire, the evidence supports a grant of summary judgment for Ecology. Atkins averred that his observations of the cattle's access to the stream was consistent with the kind of pollution found in the stream, such as sediment content, fecal coliform, and other disturbances of the water quality. This was all Ecology was required to prove under RCW 90.48.120, RCW 90.48.080, and RCW 90.48.020. It was not required to rule out other sources of pollution in the creek. Ultimately, as the Board recognized, Lemire did not dispute those facts that were operative to Ecology's order. In particular, he did not dispute that his cattle have unrestricted access to the stream.

The trial court mischaracterized Ecology's burden under the relevant statutes. It noted, "[T]he record is absolutely absent of any evidence—direct evidence—that Mr. Lemire's modest herd *actually polluted* Pataha Creek. There's no testing, there's no showing, there's no increased numbers, there's nothing." B-1 Verbatim Report of Proceedings (July 7, 2011) at 15 (emphasis added). Lemire advances this argument regarding the lack of direct causation evidence or testing. Resp't's Br. at 18-20. He maintains summary judgment cannot stand because no link was ever proved between the pollution in the creek (which he also

contends was never confirmed for the stretch of creek running on his land) and the conditions of his parcel. *Id.* at 19.

But as noted, the statute under which Ecology operates does not require it to prove causation. Ecology's expert declaration provided evidence that the *current condition* of Pataha Creek is polluted. His declaration further averred that conditions on the Lemire property—e.g., the cattle's access to the stream—are recognized causes of the discharge of organic matter into water, namely, the livestock fecal matter and sediment. *See* RCW 90.48.080. Such organic matter *tends to cause* pollution of waters. *Id.* Hence, Ecology met its statutory burden. It was not required to show that the conditions on Lemire's property were a proximate cause of the polluted creek. *See* RCW 90.48.120(1) (explaining that Ecology may issue an order when it determines that a person creates a substantial potential to violate pollution laws).

Likewise, Lemire and amici's argument that "causation" is an issue of fact that cannot be resolved on summary judgment is unavailing in light of the WPCA. *See* Resp't's Br. at 20-21; Br. of Amici Curiae Washington Cattlemen's Association et al. at 13-14. As noted, Ecology needed only to show the substantial potential to violate under RCW 90.48.080, which its expert's declaration established. Moreover, the "causation" contemplated by the statutes is the likelihood that organic or inorganic matter will cause or tend to cause pollution. RCW 90.48.080. Ecology's expert averred that fecal matter and sediment—conditions present on the Lemire property—result in pollution, and this assertion is

unchallenged by Lemire. The trial court erred when it reversed the Board's grant of summary judgment and invalidated Ecology's underlying order for lack of factual support.

The dissent chastises us for disregarding the superior court's judgment. Dissent at 19. In an APA review, as previously noted, we sit in the same position as a superior court and afford its decision no special weight. *See Griffith*, 163 Wn. App. at 6. The dissent also claims that our holding today means that "in order for a rancher to create a 'substantial potential' to pollute all the rancher has to do is (1) have a state water body on his or her property that is not completely fenced off and (2) own cattle that occasionally cross or drink from the water body." Dissent at 11-12 (footnote omitted). This is not anywhere near the fact pattern presented to us here, as our recitation of this case and the evidence before the board makes clear. As explained above, undisputed evidence in the record demonstrates that the cattle had much more than occasional access to the creek.[4] Ecology properly exercised its statutorily mandated powers and duties.

---

[4] The dissent repeats the mistake of the trial court, seizing on Lemire's assertions to deduce that the cows had "occasional" access to the creek. The trial court described Atkins's observations as "an annual observation of seeing a cow or two cross the creek and maybe you saw some manure in the creek or maybe you didn't . . . [W]as it deer, was it elk, was it the cattle?" B-1 Verbatim Report of Proceedings (July 7, 2011) at 14. This is not a fair reading of the record before the Board. The dissent accuses us of taking as "gospel truth" the declaration of Ecology's expert. Dissent at 5. But viewing the record in the light most favorable to the nonmoving party, as the summary judgment standard requires, does not require us to assume Ecology's affiant is untruthful. Moreover, there are no facts in the record to support the dissent's suggestion that Ecology's expert never actually visited the Lemire property, *id.* at 5 n.4, or that what he saw were merely gopher mounds, *id.* at 6. The material facts, while perhaps doubted by the dissent, were not disputed in the record.

We affirm the Board's grant of summary judgment because there are no genuine issues of material fact in dispute. We reverse the trial court's determination that Ecology's order was not supported by substantial evidence.

*2. Ecology did not exceed its authority in issuing the order*

An agency order may also be invalidated where it "is outside the statutory authority or jurisdiction of the agency" or the "agency has erroneously interpreted or applied the law." RCW 34.05.570(3)(b), (d). Lemire makes two separate arguments concerning Ecology's authority to issue administrative order 7178. First, he contends that Ecology lacks the jurisdiction to issue administrative orders based on nonpoint source conditions because nonpoint source conditions do not constitute a discharge under RCW 90.48.080 (the statute on which Ecology based its order). Second, he argues that the order contravenes statutory prohibitions against the impairment of water rights and the conversion of agricultural land into nonagricultural land. We address these arguments in turn.

*a. Ecology has the authority to regulate nonpoint source pollutants*

Ecology's regulatory scheme identifies two main types of pollution: point source and nonpoint source. The Washington Administrative Code (WAC) defines each.

> "Point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include return flows from irrigated agriculture.

WAC 173-220-030(18).

> "Nonpoint source" means pollution that enters any waters of the state from any dispersed land-based or water-based activities including but not limited to, atmospheric deposition, surface water runoff from agricultural lands, urban areas, or forest lands, subsurface or underground sources, or discharges from boats or marine vessels not otherwise regulated under the National Pollutant Discharge Elimination System program.

WAC 173-201A-020.

As noted, Ecology has broad authority to regulate any person causing the discharge of matters into waterways that cause or tend to cause pollution. RCW 90.48.080. Lemire argues that Ecology's authority is limited to regulating point source pollution because its regulations define "discharge of pollutant" as deriving exclusively from a point source. He cites to WAC 173-220-030(5), which reads:

> "Discharge of pollutant" and the term "discharge of pollutants" each means (a) any addition of any pollutant or combination of pollutants to surface waters of the state *from any point source*, (b) any addition of any pollutant or combination of pollutants to the waters of the contiguous zone or the ocean from *any point source*, other than a vessel or other floating craft which is being used as a means of transportation.

(Emphasis added.) Based on this definition, Lemire reads the various administrative code provisions to mean that nonpoint source pollution is not a "discharge of pollutant" and that Ecology cannot regulate nonpoint source pollution.[5]

---

[5] Alternatively, Lemire appears to be arguing that Ecology is trying to force "a quasi or backdoor permit process" and that "Ecology has no authority to require agricultural operators to obtain permits for nonpoint source pollution which are addressed through the application of best management practices." Resp't's Br. at 28. Administrative order 7178 in no way suggests that Lemire must obtain a permit, or a quasi-permit, in order to continue an operation that has substantial potential to discharge (or is discharging) pollutants into Pataha Creek. The point of Ecology's order is aimed at curbing or stopping the discharge of pollutants into the creek.

We disagree. Most importantly, the regulation defining "discharge of pollutants" is expressly applicable only to the WAC chapter governing the national pollutant discharge elimination permit program, which does not apply to nonpoint source pollutants. WAC 173-220-020 (titled "Permit Required" and explaining that "[n]o pollutants shall be discharged to any surface water of the state from a *point source*, except as authorized by an individual permit issued pursuant to this chapter" (emphasis added)). Second, the plain language of RCW 90.48.080 and RCW 90.48.020 give Ecology the authority to regulate nonpoint source pollutant discharge. Lemire's appeals to tools of statutory construction and to a dictionary definition of discharge are unavailing. Likewise, his contention that his activities do not constitute discharges under the federal CWA, Resp't's Br. at 30-31, is irrelevant to the question of Ecology's authority to regulate his activity under state law. As amici Waterkeepers Washington explain, "Lemire's actions may not be subject to a permit requirement under the [CWA], but his actions are well within the state's jurisdiction to prevent and control pollution within its borders." Amici Curiae Br. of Waterkeepers Washington in Support of State of Washington, Department of Ecology at 15. We hold that Ecology did not exceed its authority when it ordered Lemire to comply with regulations concerning nonpoint source pollutant discharge into Pataha Creek.

### b. *Ecology's order was not contrary to statutes prohibiting impairment of water rights and conversion of agricultural land*

Lemire argues that Ecology's order conflicts with a statute protecting his stock water rights, RCW 90.48.422(3), and a statute protecting the integrity of agricultural lands, RCW 90.48.450(1). Resp't's Br. at 35.

With regard to his claimed stock water rights, the trial court declined to reach this issue because the record contained no evidence of the right. CP at 191. We likewise reject this argument as lacking factual support. Lemire bore the burden to establish facts necessary to show Ecology's order was invalid. RCW 34.05.570(1)(a).

With regard to the conversion of agricultural land to nonagricultural land, RCW 90.48.450 requires Ecology to "consider whether an enforcement action would contribute to the conversion of agricultural land to nonagricultural uses" prior to issuing a notice of a violation. Lemire argues that Ecology offered no proof on this point. Ecology responds that had Lemire timely raised it as an affirmative defense at the hearings stage, Ecology could have offered evidence of the measures taken to meet the statutory requirement. Reply Br. of Appellant at 17. Resolution of this issue comes down to the burden of proof. At this stage of the proceedings, we must presume Ecology's order was valid. Again, we resolve this issue based on Lemire's failure to meet his burden of proof under RCW 34.05.570(1)(a).

We hold that Ecology is authorized to regulate nonpoint source pollution, and there is no evidence suggesting that Ecology otherwise contravened statutory provisions.

The remaining issue is whether Ecology's order impaired Lemire's constitutional rights.

B. Ecology's administrative order did not effect an unconstitutional taking

Lemire contends that Ecology's order constitutes a taking in that it deprives him of economic use of his land because (1) the fence he has been ordered to put up along the riparian corridor will prevent his cattle from grazing pasturelands on the far side of the creek and (2) the fence will prevent him from exercising his stock water rights. The trial court accepted Lemire's argument and invalidated Ecology's order.

The parties and amici strenuously debate the framework upon which this court should rest a taking analysis, including whether and to what extent our state constitutional takings provision may offer greater protection than its federal counterpart. *Compare* U.S. CONST. amend. V, *and* WASH. CONST., art. I, § 16. But we need not answer any of these questions today because there is no factual basis for finding a taking.

First, Lemire has not established that Ecology's order actually destroys his cattle's ability to cross the creek to the pastureland on the other side. Lemire asserts that the "salient factual issues were not disputed" below and that the order "mandated installation of exclusionary fencing and prohibited livestock from the

riparian corridor." Resp't's Br. at 36. But Ecology did dispute the claim that its order restricts the cattle from any access to the creek. Reply Br. of Appellant at 21. *Compare* CP at 102 (Lemire's briefing before the trial court, arguing that the order "precluded [livestock] from utilizing the area" and that "[s]uch a requirement constitutes a 'taking' for constitutional purposes"), *with* CP at 129 (Ecology's trial court briefing explaining that Lemire's plan to prevent pollution and protect water quality "may include provisions for cattle crossing the creek, limited access to the creek for watering, and off-creek drinking water supply."). The record contains no finding in support of Lemire's assertion as to the effect of Ecology's order.

Second, the trial court concluded that the administrative record was silent as to the stock water rights Lemire claims. Therefore, any claimed invasion of such rights cannot support a takings finding. Further, Lemire concedes that his claim of economic loss is neither a physical invasion nor a regulatory taking. Resp't's Br. at 38. Thus, on this record, we cannot agree that as a matter of law a per se taking was established. Lemire failed to prove that he has suffered any economic loss, let alone an economic loss that constitutes a taking. We reverse the trial court.

C. Attorney fees under the equal access to justice act (EAJA)

The trial court granted attorney fees to Lemire under the EAJA. CP at 191. That statute provides:

> Except as otherwise specifically provided by statute, a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified or that circumstances make an award unjust. A qualified party shall be considered to have

prevailed if the qualified party obtained relief on a significant issue that achieves some benefit that the qualified party sought.

RCW 4.84.350(1). Because we reinstate the Board's decision, Lemire is not the prevailing party. Accordingly, he is not entitled to a fee award under RCW 4.84.350(1).

## CONCLUSION

We reverse the trial court and reinstate the Board's decision on summary judgment upholding Ecology's administrative order 7178. The underlying order was supported by substantial evidence, and Ecology has the authority to regulate nonpoint source pollution. The trial court's conclusion that Ecology's order constituted a taking is unsupported by the record. Because Lemire is not the prevailing party for purposes of the EAJA, we further reverse the trial court's award of fees and costs.

Stephens, J.

WE CONCUR:

Madsen, C.J.

Wiggins, J.

Owens, J.

González, J.

Fairhurst, J.

Chambers, J.P.T.

No. 87703-3

J.M. JOHNSON, J. (dissenting)—Glossing over genuine issues of material fact, the majority rubber stamps the Pollution Control Hearings Board's (Board) decision and overturns the trial court's grant of summary judgment. The Department of Ecology's (Ecology) order is extremely burdensome and may "take" seven acres of this farm, as the trial court held. The order here converts land that was homesteaded in the 1800s, which has been continuously used for agricultural purposes since that time, into nonagricultural property. The order also may force a rancher, whose retirement is tied up in his small farming and ranching operation, to spend tens of thousands of dollars to erect the very fence that will keep him from using a significant portion of his property.[1,2] Ignoring the obvious stakes,

---

[1] Interestingly, the majority never mentions that it is over seven acres of land of this small farm and ranch that is being taken or converted for state conservation purposes. *See* Br. of Appellant at 36; Resp't's Br. at 2.

[2] On several occasions, Ecology proposed to financially help or bear this burden. We will see.

1

disputed facts, and a state constitution that provides strong protection to private property rights, the majority denies Joseph Lemire his judgment from a court with unquestioned jurisdiction. Because the majority disregards constitutionally protected private property rights, and bases its decision on credibility judgments and factual findings, the law requires us to return the case to the trial court. I therefore dissent. On other issues such as Ecology's statutory authority, I have assumed the majority rulings.

PROCEDURAL HISTORY

Ecology issued its order in 2009. Lemire challenged the order before the Board. Ecology moved for summary judgment, which the Board granted.

Lemire properly appealed the Board's decision to the Columbia County Superior Court, Judge William D. Acey presiding. After a thorough review of the administrative record, Judge Acey reversed the summary judgment determination, invalidated the agency order for lack of evidence, and ruled that the order affected an unconstitutional taking. Given the record, Judge Acey was especially troubled by the fact that Lemire "never had his day in court." Verbatim Report of Proceedings at 16. Ecology

appealed to Division Three of the Court of Appeals, which certified the case to this court.

ANALYSIS

I.  There Are Genuine Issues of Material Fact that Preclude Summary Judgment

In an appeal under the Administrative Procedure Act (APA), chapter 34.05 RCW, we are to confine our review of disputed issues of fact to the administrative record. RCW 34.05.558. Additionally, "where the original administrative decision was on summary judgment, . . . [we] must overlay the APA standard of review with the summary judgment standard." *Verizon Nw., Inc. v. Emp't Sec. Dep't*, 164 Wn.2d 909, 916, 194 P.3d 255 (2008). Consequently, in an appeal of an administrative grant of summary judgment, we are to view the facts in the administrative record in the light most favorable to the nonmoving party and review conclusions of law de novo. *Id.* Summary judgment is appropriate only "where the undisputed facts entitle the moving party to judgment as a matter of law." *Id.*

The operative statutes in this case, RCW 90.48.080 and RCW 90.48.120, make it illegal to pollute and give Ecology the authority to initiate an enforcement action against someone who "creates a substantial

potential to violate" the State's pollution laws.[3]   RCW 90.48.120. Presumably, all landowners could potentially violate the state's pollution laws, so when Ecology has not proved a direct violation but still wants to initiate an enforcement action, the key word in the statute is "substantial." *Id.*   The dictionary defines "substantial" as "having a solid or firm foundation" or being "soundly based."   WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2280 (2002).   Here, the key to the Board's erroneous grant of summary judgment was its finding that there were "no materially disputed facts about the potential for discharge of organic material to state waters . . . ." Administrative Record (AR) 12, at 12 (Order Granting Mot. to Dismiss and Mot. for Summ. J.). The Board's omission of the word "substantial" is telling of its mentality.

The Board and the majority myopically focus on the allegations in Ecology's declaration. Disregarding the legally required standard of review for summary judgment, the Board and the majority assumed that Ecology's allegations are gospel truth[4] and summarily dismissed the statements in

---

[3] Notably, the arguable vagueness of the "substantial potential" standard has not been argued nor resolved.

[4] The majority refers to Ecology's employee, Chad Atkins, as an expert in water quality. Majority at 6.  Atkins may be able to qualify as such, but no court made that "expert"

Lemire's declaration that counter Ecology's claims as "conclusory allegations." *See* AR 12, at 13; majority at 8. An examination of the allegations and Lemire's corresponding responses will illustrate my point.

After eight sporadic site visits spread out over a six-year period, visiting mostly during the winter months and never in the summer or fall,[5] and observing the property only from a distance, Ecology makes a number of allegations about the conditions on the Lemire property. First, Ecology claims there is overgrazing of the riparian corridor and consequently, bare ground along the creek. AR 7 (Decl. of Chad Atkins at 3). Lemire responds that the absence of vegetative growth along the creek in the winter and early spring months (when Ecology made its observations) is due to the fact that the creek dries up sometime between July and December. AR 9 (Decl. of

---

determination. ER 702. It is unclear, however, without more foundation whether Atkins' statements regarding the conditions he claims to have observed from a distance—clear outside the farm and from a passing highway—would be admissible in court. A fact witness is required to establish enough foundation to show that he or she has personal knowledge of the facts in question. ER 602. From the record, we do not know where Atkins was when he made his observations, what time of day it was, how long he stayed to observe, how it was that he was able to see the detail he describes from an observation site somewhere off of Lemire's property, etc. It appears Atkins made most observations from his car along Highway 12, which bisects Lemire's property.

[5] It is not insignificant that Atkins spent six years trying to make a case against Lemire. Ecology made one visit in February 2003, one visit in February 2005, one visit in February 2006, one visit in March 2008, and then a series of four visits in succession in 2009 when it was ramping up its efforts in anticipation of the enforcement order: two in March, one in April, and one in early May. AR 7 (Decl. of Chad Atkins at 3).

Lemire at 1). Moreover, Lemire claims that the large bluff on the south side of the property casts a shadow over the creek during these months so that little to no direct sunlight touches the creek leaving the banks covered in growth-inhibiting frost. *Id.* at 1. Lemire asserts that there is in fact a healthy five to seven inches of grass that grows along the creek in the late spring. AR 1, at 2 (Notice of Appeal). Moreover, Lemire claims he uses the "best management practice" of flash grazing (a very limited grazing regime) in order to protect riparian vegetation. *Id.* If a parcel is overgrazed, it does not have enough vegetative cover. Was Lemire's property overgrazed or just experiencing a normal lack of vegetative growth during the colder winter and early spring?

Second, Ecology claims that Atkins observed manure in the stream corridor. AR 7 (Decl. of Chad Atkins at 3). Lemire counters that what Atkins saw (again, from a distance) were gopher mounds. AR 1, at 1. Lemire asserts that the cattle are not even permitted access to the creek from late November through the run-off period in April (the time period in which most of Atkins' visits and observations took place) to protect them from flash flooding caused by heavy rains and snow melt. AR 9 (Decl. of Lemire

at 5). So, the obvious factual issue arises: Was a polluting substance seen by Atkins?

Third, Ecology claims there is inadequate woody vegetation along the stream banks. AR 7 (Decl. of Chad Atkins at 3). Lemire maintains that there are a variety of trees of various species growing along the creek. AR 9 (Decl. of Lemire at 2). However, Lemire states that when he originally purchased the property in 1991, there was little brush or woody species. *Id.* Also, Lemire testifies that some of the trees have recently been taken by the local beaver population as well as by fire. *Id.* Lemire testifies that cattle do not damage the bushes and trees because they have ample room to maneuver. *Id.* Lemire also cites studies, including the Northwest Power and Conservation Council's Tucannon Subbasin Plan, that he argues show that the "shrub-steppe" species commonly found on the Columbia Plateau do not grow in the Tucannon Subbasin where his farm is located. *Id.* This record does not establish whether climate and nature or Lemire's cattle cause the alleged "inadequacy"[6] of woody vegetation along the creek.

---

[6] Again, a vague and subjective criterion.

Fourth, Ecology claims that there are trampled stream banks, cattle trails across the creek, and erosion, all as a result of cattle in the riparian corridor. AR 7 (Decl. of Chad Atkins at 3). Lemire says that any erosion is due to natural processes (erosion is how streams are formed in the first place), especially during the wintertime when vegetation is naturally sparse.[7] AR 1, at 2. Moreover, during the colder months, Lemire says that the ground along the creek bank is naturally distorted by ice and frost formation, which is known to cause soil movement. *Id.*

Lemire concedes that at an earlier time he discovered a few places where the cattle were breaking down a higher bank and that he solved that problem by installing drift fencing in each such location. AR 9 (Decl. of Lemire at 5). Additionally, Lemire contends that the cattle do not linger in the riparian corridor, but mostly cross the creek to get to food in the other pasture lands (that are otherwise inaccessible) and that when they do cross they use the same small trails. *Id.* at 1, 5. In an assertion undisputed by Ecology, Lemire notes the banks of the creek are mostly 10-12 feet high, so

---

[7] WAC 173-201A-260(1)(a) recognizes that sometimes water bodies "cannot meet the assigned criteria due to the natural conditions of the water body" and that when this occurs "due to natural climatic or landscape attributes, the natural conditions constitute the water quality criteria."

the cattle could not walk on the banks or cross the creek at those places. *Id.* Given that Ecology is now stating it would be acceptable for Lemire to install gates in the fence to allow his cattle to access otherwise inaccessible pastureland, the type of erosion Ecology claims it is seeking to prevent cannot be caused by cattle periodically crossing from one pastureland to another. *See* Br. of Appellant at 36. The record leaves an open factual question as to whether the type of erosion that Ecology is seeking to prevent is actually occurring, or may occur absent the order, requiring remand to the court for resolution.

Fifth, Ecology alleges that Lemire's cattle "wallow" in the creek. AR 7 (Decl. of Chad Atkins at 4). The dictionary defines "wallow" as "to roll or move oneself about in an indolent ungainly manner" or "sprawl luxuriously." WEBSTER'S, *supra*, at 2573. Lemire notes that Atkins did not actually view any cattle "wallowing" because cattle do not wallow: they get stuck in mud, so they prefer firm dry ground. AR 9 (Decl. of Lemire at 4). Lemire states that cattle lying down in a creek may even drown. *Id.* Cattle often use their heads and necks to right themselves and when they are on slick ground it may mean that they keep their mouths and noses under water

for too long while they are attempting to get up. *Id.* Again, remand is appropriate to resolve this unlikely and unsupported allegation of harm.

Finally, Ecology claims that the cattle have direct, continual, and uncontrolled access to the creek and that there is a livestock confinement area adjacent to the creek. AR 7 (Decl. of Chad Atkins at 3-4). Lemire responds that he constantly monitors his cattle and that the cattle are not allowed access to the creek from late November through the run-off period in April due to possible flash flooding. AR 9 (Decl. of Lemire at 5). Lemire further alleges that there was a two-year period between 2003 and 2009 in which no cattle ever accessed the creek. AR 1, at 3. Additionally, Lemire argues that he has implemented best management practices since 1994. AR 9 (Decl. of Lemire at 3). For example, Lemire locates salt licks, the cattle's watering troughs (one in each pasture), and the cattle's feed several hundred yards to over three-quarters of a mile away from the creek, all in an effort to protect the riparian corridor. *Id.*; AR 1, at 1.

Lemire concedes that there is currently no fence stretching across the entire creek on both sides, that the cattle will cross the creek to get to other pastures (something Ecology apparently will have no problem with in the future), and that the cattle will occasionally drink from the creek (again,

Ecology said that this would be no violation).[8] *See* Clerk's Papers (CP) at 129; Br. of Appellant at 36. Lemire reiterates, however, that he does not concentrate the cattle on the stream banks by placing feed near the banks or in any other manner. AR 1, at 1. As noted in detail above, Lemire contests Ecology's argument (not testimony) that his cattle have "uncontrolled" and "continual" access to the creek. The claim that Lemire's cattle have "unrestricted access to the stream," i.e., wander all over the property and creek without any sort of guidance or control, is clearly contested.[9] *See* majority at 9.

In sum, Lemire conceded that there is no continuous fence on the property like the one Ecology seeks, that cattle occasionally drink from and cross the creek, and that whenever cattle were breaking down points along the high bank of the creek he fixed that problem with drift fencing. Lemire contested every other Ecology assertion of fact. Consequently, according to the Board and the majority, in order for a rancher to create a "substantial potential" to pollute, all the rancher has to do is (1) have a state water body

---

[8] Especially when Lemire's electrical water pump system for groundwater fails because of a power outage or the pipes freeze and he cannot fill the troughs. AR 9 (Decl. of Lemire at 5). Lemire says this usually happens one or two days a year. *Id.*

[9] The drift fencing Lemire installed is one obvious example of how Lemire has controlled and guided his cattle's movement on the property. AR 9 (Decl. of Lemire at 5).

on his or her property[10] that is not completely fenced off and (2) own cattle that occasionally cross or drink from the water body. That is it. Nothing else needs to be proved but those facts. Surely, that cannot be what the 1945 legislature intended by "substantial potential to violate." RCW 90.48.120(1). That conclusion is strongly called into question by all the

---

[10] The majority incorrectly suggests that evidence that Pataha Creek is polluted is sufficient proof (entitling Ecology to summary judgment) that the conditions necessary to create a substantial potential to violate exist on Lemire's property. For example, the majority makes sure we know that the "[t]he creek is a polluted waterbody" and that the alleged "pollution of the creek is consistent with what one would expect from the conditions at the Lemire property," but the majority is not so quick to point out that Ecology's order is no way dependent on Pataha Creek's polluted status. Majority at 8. Ecology makes it very clear that it is not and does not have to rely on any testing. AR 7 (Ecology's Mot. to Dismiss and Mot. for Summ. J. at 25-26). Even if a water body is polluted, Ecology must still meet its burden by proving that conditions that create a substantial potential of violation exist on the property in question. It is important to note, however, that Ecology may have to prove causation in any future enforcement action against Lemire.

Ecology's regulations require activities which generate nonpoint source pollution to be controlled by the application of BMPs. WAC 173-201A-510(3)(a). The regulations further require a nonpoint source polluter to apply all appropriate best management practices. WAC 173-201A-510(3)(b). If a nonpoint source polluter is applying "all best management practices appropriate or required by the department and a *violation* of water quality criteria occurs, the discharger shall modify existing practices or apply further water pollution control measures, selected or approved by the department, to achieve compliance with water quality criteria." *Id.* (emphasis added). Thus, if Lemire complies with Ecology's order in full, the only way for Ecology to force Lemire to apply further control measures would be for Ecology to prove that Lemire has caused a violation of water quality criteria. This is significant because the record reflects the strong possibility that pollution sources upstream from Lemire's property and downstream from Lemire's property (but upstream from Ecology's testing site) are significant contributors to the pollution of Pataha Creek. AR 1, at 8. Ecology cannot continue to bring its regulatory might to bear on Lemire alone when he has complied with this burdensome order and Pataha Creek is not cured of all of its pollution problems without direct proof that Lemire's property is in fact a source of pollutants.

12

other legislation in place protecting the use of agricultural land and stockwater rights. *See, e.g.*, RCW 90.48.422(3) (protecting water rights from Ecology action); RCW 90.48.450 (requiring Ecology to avoid enforcement actions that would contribute to agricultural land being converted into nonagricultural purposes). That conclusion is further contradicted by the position Ecology took before the superior court and then later before this court that Lemire would be able to install gates in the required fencing to allow the cattle to cross and drink from the creek.[11] CP at 129; Br. of Appellant at 36.

Lemire's statements amount to much more than "conclusory allegations"[12] and create genuine issues of material fact about whether or not the conditions Ecology's witness (not a qualified "expert") allegedly observed are present. An appellate court must evaluate the evidence

---

[11] If we confined our review to the administrative record, like we are supposed to, the order strongly suggests that the cattle would never be allowed to enter the riparian corridor, let alone cross the creek to access the other pastures or to drink. AR 1 (Ecology Order 7178, at 2-3).

[12] Just as Atkins would likely qualify as an expert for purposes of a trial due to his training and experience, Lemire also would likely qualify as an expert in farming, ranching, and cattle behavior for similar reasons. As a fact witness, Lemire has certainly observed his cattle with more frequency than Atkins. Consequently, the Board's cursory dismissal of Lemire's statements as "conclusory allegations" was inappropriate. *See* AR 12, at 13.

presented in the record in the light most favorable to the nonmoving party. The majority impermissibly made its own credibility judgment when it sided with Ecology.

Given the presence of genuine issues of material fact as to whether or not the many detrimental conditions alleged by Ecology actually exist, however, I would remand the case to conduct a hearing. A hearing would be the proper place to judge credibility and would result in a proper record for an appeal.[13]

II.     Ecology's Authority To Issue the Order

I assume the majority's finding that RCW 90.48.080 and RCW 90.48.120 on their face allow Ecology to regulate some nonpoint sources of pollution. I also agree that we should not reach the issue of stockwater rights given the lack of evidence in the record.[14] Likewise, I agree that it would be improper for this court to invalidate the order on the basis of RCW 90.48.450 when Lemire failed to timely raise the issue before the Board.

---

[13] The stakes are high for Lemire. Lemire must either construct a fence that will likely cost tens of thousands of dollars, give up ranching, or be subject to what will likely be substantial financial penalties. *See* RCW 90.48.142; .367.

[14] Moreover, it is now Ecology's position that Lemire's cattle can drink from the creek. CP at 129; Br. of Appellant at 36.

III. <u>Takings</u>

I briefly write on this topic to make it clear that the "question" of whether or not our state constitutional takings provision offers greater protection than its federal counterpart has already been answered in the affirmative.[15] *See* majority at 15. *E.g., Manufactured Hous. Cmtys. of Wash. v. State,* 142 Wn.2d 347, 357-361, 13 P.3d 183 (2000) (holding that article I, section 16 of the Washington Constitution offers broader protection than the Fifth Amendment to the United States Constitution); *Brutsche v. City of Kent,* 164 Wn.2d 664, 681 n.11, 193 P.3d 110 (2008) ("We have held in other cases that article I, section 16 provides, in some ways, greater protection."). Among other differences between the state and federal takings provisions, article I, section 16 states that "[n]o private property shall be taken or *damaged* for public or private use without just compensation having been first made . . . ." WASH. CONST. art. I, § 16 (emphasis added). The extent of this greater protection has not yet been fully delineated in all contexts.

---

[15] The conversion of agricultural land to other use is statutorily restricted. Lemire even attached RCW 90.48.450 to his notice of appeal.

The superior court found that Ecology's order constituted a per se taking. Under state and federal law there is a per se or categorical taking when:

> (1) a regulation effects a total taking of all economically viable use of one's property; or (2) the regulation has resulted in an actual physical invasion upon one's property; or (3) a regulation destroys one or more of the fundamental attributes of ownership (the right to possess, exclude others and to dispose of property); or (4) the regulations were employed to enhance the value of publicly held property.

*Manufactured Hous.*, 142 Wn.2d at 355 (citations omitted). Despite the additional protection our state constitution affords, the record before us presents insufficient facts for us to conclude that there has been a per se taking, though the court below so held.[16, 17]

---

[16] On appeal, Lemire concedes that there has been no physical invasion or total regulatory taking. Resp't's Br. at 38. Lemire's argument instead is that there has been a partial regulatory taking because there has been a "derogation or destruction of a fundamental attribute of property ownership." *Id.* at 39 (citing *Guimont v. Clarke*, 121 Wn.2d 586, 603, 854 P.2d 1 (1993)).

[17] Notably, the United States Supreme Court's recent decision in *Koontz v. St. Johns Water Management District*, 570 U.S. ___, 133 S. Ct. 2586, ___ L. Ed. 2d ___ (2013), also expands property owners' ability to challenge local land use regulations and fees. In *Koontz*, the Court said that a landowner may challenge a government's decision to deny a land use permit or condition approval of a land use permit on the payment of fees using the standards set forth in *Nollan v. California Coastal Commission*, 483 U.S. 825, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994). *Id.* at 2589. Here, there was no permit, but arguably worse, the threat of enforcement (including criminal charges) against the use of one's own property. *Koontz*, however, illustrates the continued strength of private property rights under our federal constitution.

Lemire claims that the fence will prevent his cattle from grazing pasturelands on the far side of the creek, that it will prevent him from exercising his stockwater rights, and that it will derogate his "fundamental property interests by denying the full and complete right to occupy and possess" his property. Resp't's Br. at 45. If we review the order, it clearly does not make any specific provision for the cattle to drink from or cross the creek. AR 1 (Ecology Order 7178, at 2). To the contrary, it requires "exclusion fencing," "off-stream watering facilities," and that Lemire eliminate "[l]ivestock access to the stream corridor . . . by May 31, 2010." *Id.* at 2-3. It was only later in its briefing to the superior court and before this court that Ecology finally clarified that Lemire's cattle would be allowed to drink from and cross the stream to reach the other pasturelands; this is argument, and it contradicts the challenged order in the record. CP at 129; Br. of Appellant at 36.

The order does, however, fence off approximately 7.23 acres of nonriparian land. Br. of Appellant at 36; Resp't's Br. at 3. Lemire claims that he has only about 40 acres of flat irrigated land suitable for farming and that the order's fencing requirement (35 feet out from the top of the stream bank on each side measured horizontally) will significantly cut into his crop

production. AR 1 at 3. Lemire will no longer be able to graze his cattle in this area nor will he be able to farm the land. Assuming all 7.23 acres is farmable, the order converts approximately 18% of Lemire's farmland into nonagricultural land.[18] Moreover, if Lemire decides to sell his property at some point in the future, undoubtedly the 7.23 acres will have to be sold at a substantially reduced price or for no value at all.

Considering the fundamental attributes of property this court has identified to date, from this record it does not appear that any of the fundamental attributes of Lemire's property have been destroyed. Lemire is still the owner of the enclosed land, can still exclude others from occupying it, and can still transfer the land. Unlike the landowners in *Manufactured Housing*, it does not appear that the order takes any of the sticks in Lemire's bundle of property rights. *See Manufactured Hous.*, 142 Wn.2d at 367. It is possible that Lemire's property has been "damaged" by the order, but there is not enough evidence in the record to establish the type and magnitude of this damage.[19] *See* WASH. CONST. art. I, § 16.

---

[18] *See supra* note 15 (citing RCW 90.48.450).

[19] Acknowledging that I write in dissent, it is my sincere hope that Ecology will attempt to help Lemire secure a source of funding for this expensive fence. It would be an

CONCLUSION

By upholding the Board's grant of summary judgment and reversing the judgment of the superior court, the majority makes an implicit finding that the Department of Ecology is more credible than Mr. Lemire. An evaluation of credibility, however, has no place in the review of a grant of summary of judgment. It is the province of the fact finder below. Because we are required to evaluate the evidence presented in the administrative record in the light most favorable to Lemire, the nonmoving party, I would remand the case for a hearing. It is clear from the record that there are genuine issues of material fact.

The majority's contrary decision disregards a judgment of a superior court and undermines, if not destroys, the value of Mr. Lemire's agricultural land that is entitled to statutory and likely constitutional protection. I dissent.

---

injustice if Lemire had to sell his farm or close down his cattle operation because he could not afford the fence.