

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE **NOV 1 4 2019**

for  CHIEF JUSTICE

This opinion was
filed for record
at 8 a.m. on Nov 14 2019

Susan L. Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| CHONG and MARILYN YIM, KELLY LYLES, BETH BYLUND, CNA APARTMENTS, LLC, and EILEEN, LLC, | ) ) ) ) ) | No. 95813-1 |
| Respondents, | ) ) | En Banc |
| v. | ) ) | |
| CITY OF SEATTLE, | ) ) | |
| Appellant. | ) ) ) | Filed: **NOV 1 4 2019** |

YU, J.— This case concerns the constitutionality of Seattle's "first-in-time rule" (FIT rule), Seattle Municipal Code (SMC) 14.08.050. Broadly speaking, the FIT rule provides that Seattle landlords seeking to fill vacant tenancies must provide notice of their rental criteria, screen all completed applications in chronological order, and offer tenancy to the first qualified applicant, subject to certain exceptions. The plaintiffs are Seattle landlords, who claim the FIT rule facially violates their state constitutional rights.

On cross motions for summary judgment, the trial court ruled that the FIT rule is unconstitutional on its face because (1) the FIT rule facially effects a per se regulatory taking for private use in violation of article I, section 16, (2) the FIT rule facially infringes on the plaintiffs' substantive due process rights in violation of article I, section 3, and (3) the FIT rule facially infringes on the plaintiffs' free speech rights in violation of article I, section 5. WASH. CONST. art. I, §§ 16, 3, 5. Defendant city of Seattle (City) appealed. We granted direct review and now reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

In September 2014, Seattle's mayor and the Seattle City Council appointed a committee "to evaluate potential strategies to make Seattle more affordable, equitable, and inclusive." Clerk's Papers (CP) at 319. The committee recommended "a multi-prong approach of bold and innovative solutions." *Id.* After considering the committee's recommendations, the Seattle City Council amended Seattle's Open Housing Ordinance, ch. 14.08 SMC. These amendments included adoption of the FIT rule.

The FIT rule provides that when a Seattle property owner seeks to fill a tenancy, the owner must first "provide notice to a prospective occupant" of "the criteria the owner will use to screen prospective occupants and the minimum threshold for each criterion," as well as "all information, documentation, and other

2

submissions necessary for the owner to conduct screening." SMC 14.08.050(A)(1)(a)-(b). Next, the property owner must "note the date and time of when the owner receives a completed rental application" and "screen completed rental applications in chronological order." *Id.* at (A)(2)-(3). "If, after conducting the screening, the owner needs more information than was stated in the notice," the owner must "notify the prospective occupant in writing, by phone, or in person of what additional information is needed." *Id.* at (A)(3). Finally, the property owner must "offer tenancy of the available unit to the first prospective occupant meeting all the screening criteria necessary for approval of the application." *Id.* at (A)(4). The first qualified applicant has 48 hours in which to accept the offer of tenancy. *Id.* If the applicant does not accept, "the owner shall review the next completed rental application in chronological order until a prospective occupant accepts the owner's offer of tenancy." *Id.*

There are a number of exceptions to these general procedures. No part of the FIT rule applies "to an accessory dwelling unit or detached accessory dwelling unit wherein the owner or person entitled to possession thereof maintains a permanent residence, home or abode on the same lot." *Id.* at (F). In addition, an owner does not have to offer tenancy to the first qualified applicant if the owner "is legally obligated to" or "voluntarily agrees to set aside the available unit to serve specific vulnerable populations." *Id.* at (A)(4)(a)-(b). The FIT rule also contains

3

procedures for potential occupants with disabilities to seek "additional time to submit a complete rental application because of the need to ensure meaningful access to the application." *Id.* at (B).

The FIT rule became effective on January 1, 2017, although compliance was not required until July 1, 2017. *Id.* at (A), (E). On August 16, 2017, the plaintiffs filed a first amended complaint, "seeking a declaration that the City's [FIT] rule . . . violates the Takings, Due Process, and Free Speech Clauses of the Washington State Constitution, and also seeking a permanent injunction forbidding the City from enforcing its unconstitutional rule." CP at 19. The plaintiffs challenge the FIT rule only "on its face," not as applied. *Id.* at 30, 33.

The parties filed cross motions for summary judgment based on a statement of stipulated facts and a stipulated record. The trial court ruled in favor of the plaintiffs on each of their claims, concluding that the FIT rule facially violates article I, section 16 (the takings clause), section 3 (the due process clause), and section 5 (the free speech clause) of the Washington State Constitution. The City appealed, and we granted direct review. Order, No. 95813-1 (Wash. Nov. 28, 2018).

## ISSUES

A.     Does the FIT rule facially effect a regulatory taking for purposes of article I, section 16?

B. If the FIT rule does facially effect a regulatory taking, is it for private use in violation of article I, section 16?

C. Does the FIT rule facially violate the plaintiffs' article I, section 3 right to substantive due process?

D. Does the FIT rule facially violate the plaintiffs' article I, section 5 right to free speech?

## ANALYSIS

This case presents two important questions of state constitutional law that will have consequences far beyond the particular claims at issue here. First, we must define when a law regulating the use of property crosses the line into a "regulatory taking" for purposes of article I, section 16. Second, we must determine the standard of review that applies to article I, section 3 substantive due process challenges to laws regulating the use of property.

As to the first issue, this court has always attempted to define regulatory takings consistently with federal courts applying the takings clause of the Fifth Amendment. U.S. CONST. amend. V. The federal definition of regulatory takings has been substantially clarified since we last considered the issue, such that the "legal underpinnings of our precedent have changed or disappeared altogether." *W.G. Clark Constr. Co. v. Pac. Nw. Reg'l Council of Carpenters*, 180 Wn.2d 54, 66, 322 P.3d 1207 (2014). It has not been shown that we should adopt a

Washington-specific definition as a matter of independent state law at this time, and we therefore adopt the definition of regulatory takings set forth by the United States Supreme Court in *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 125 S. Ct. 2074, 161 L. Ed. 2d 876 (2005), as discussed in more detail below. The following precedent is disavowed to the extent that it defines regulatory takings in a manner that is inconsistent with *Chevron U.S.A.*: *Orion Corp. v. State*, 109 Wn.2d 621, 747 P.2d 1062 (1987); *Presbytery of Seattle v. King County*, 114 Wn.2d 320, 787 P.2d 907 (1990); *Sintra, Inc. v. City of Seattle*, 119 Wn.2d 1, 829 P.2d 765 (1992); *Robinson v. City of Seattle*, 119 Wn.2d 34, 830 P.2d 318 (1992); *Guimont v. Clarke*, 121 Wn.2d 586, 854 P.2d 1 (1993); *Margola Associates v. City of Seattle*, 121 Wn.2d 625, 854 P.2d 23 (1993); and *Manufactured Housing Communities of Washington v. State*, 142 Wn.2d 347, 13 P.3d 183 (2000) (plurality opinion).

Regarding the second issue, as analyzed in more detail in our opinion for *Chong Yim v. City of Seattle*, No. 96817-9 (Wash. Nov. 14, 2019) (*Yim II*), this court has always attempted to apply a standard of review to article I, section 3 substantive due process claims that is consistent with the standard used by federal courts applying the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution. As with defining regulatory takings, it has not been shown that we should depart from federal law at this time, and we therefore apply

6

rational basis review to the plaintiffs' substantive due process challenge to the FIT rule.

Turning to the specific claims presented in this case, the constitutionality of the FIT rule is a question of law reviewed de novo. *Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 215, 143 P.3d 571 (2006). The plaintiffs' facial takings and substantive due process claims cannot succeed unless the plaintiffs show that "no set of circumstances exists in which [the FIT rule], as currently written, can be constitutionally applied." *City of Redmond v. Moore*, 151 Wn.2d 664, 669, 91 P.3d 875 (2004). They cannot meet that burden on the record presented, while the City has met its burden of justifying the FIT rule for purposes of the plaintiffs' facial free speech claim. We therefore reverse and remand with instructions to grant the City's motion for summary judgment.

A.    The FIT rule does not facially effect a regulatory taking

The takings clause of the Fifth Amendment provides, "[N]or shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. Likewise, article I, section 16 provides, "No private property shall be taken or damaged for public or private use without just compensation having been first made." WASH. CONST. art. I, § 16. Both the federal and state takings clauses allow for "[c]laims of inverse condemnation by excessive regulation," otherwise known as "regulatory takings" claims. *Orion Corp.*, 109 Wn.2d at 642.

Regulatory takings claims are based on the premise that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S. Ct. 158, 67 L. Ed. 322 (1922). When a regulation goes too far, it becomes "a de facto exercise of eminent domain," even though the private individual still actually owns and possesses the property. *Orion Corp.*, 109 Wn.2d at 645. Such regulatory takings, like traditional exercises of eminent domain, require either just compensation (if the property is taken for public use) or invalidation of the law (if the property is taken for private use). *Mfd. Hous.*, 142 Wn.2d at 362.

Regulatory takings may be either "per se" or "partial." A per se regulatory taking is found where a regulation's impact is necessarily so onerous that the regulation's mere existence is, "from the landowner's point of view, the equivalent of a physical appropriation." *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1017, 112 S. Ct. 2886, 120 L. Ed. 2d 798 (1992). As a matter of federal law, such categorical treatment is appropriate for only "two relatively narrow categories" of regulations—regulations that "require[ ] an owner to suffer a permanent physical invasion of her property" and "regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her property." *Chevron U.S.A.*, 544 U.S. at 538

(second alteration in original) (quoting *Lucas*, 505 U.S. at 1019).[1] All other regulations are susceptible of partial regulatory takings claims, which federal courts decide based on a multifactor test (the *Penn Central* factors) applied on a case-by-case basis. *Id.* at 538-39 (citing *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978)).

The plaintiffs here claim the FIT rule facially effects a per se regulatory taking, but they do not contend that it fits into either of the per se categories recognized by federal courts. Instead, they contend that Washington courts recognize another category of per se regulatory takings, which includes any regulation that "destroys one or more of the fundamental attributes of ownership (the right to possess, exclude others and to dispose of property)." *Mfd. Hous.*, 142 Wn.2d at 355. The plaintiffs argue that the FIT rule falls into this per se category "because it strips landlords of a fundamental attribute of property ownership—the right to choose to whom one will rent their property." Resp'ts' Br. at 1.

We now clarify that none of our regulatory takings cases have purported to define regulatory takings (either per se or partial) as a matter of independent state law. Instead, we have always attempted to discern and apply the federal definition

---

[1] There is another form of takings cases not relevant here that deals with "adjudicative land-use exactions—specifically, government demands that a landowner dedicate an easement allowing public access to her property as a condition of obtaining a development permit." *Chevron U.S.A.*, 544 U.S. at 546 (citing *Dolan v. City of Tigard*, 512 U.S. 374, 379-80, 114 S. Ct. 2309, 129 L. Ed. 2d 304 (1994); *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 828, 107 S. Ct. 3141, 97 L. Ed. 2d 677 (1987)).

of regulatory takings. Since we last attempted to do so, the federal definition has been clarified substantially and is now clearly inconsistent with the definitions set forth in our precedent. Thus, the legal underpinnings of our precedent have disappeared, and it has not been shown that we should now adopt a Washington-specific definition of regulatory takings as a matter of independent state law.

Therefore, we disavow our precedent, adopt the federal definition of regulatory takings, and hold that the plaintiffs cannot show the FIT rule facially meets this definition on the record presented. We express no opinion as to whether the FIT rule effects a regulatory taking as applied to any particular property.

1.      We have never defined regulatory takings as a matter of independent state law

The plaintiffs emphasize that their takings claim is based on the Washington State Constitution and contend that "[t]he federal approach to takings therefore does not offer a relevant comparison because this Court can interpret its own state constitution as it sees fit—so long as its interpretation does not go below the floor of protection guaranteed by the Federal Constitution." *Id.* at 20-21. It is certainly true that we have the authority to interpret article I, section 16 independently of the Fifth Amendment's takings clause. However, it is incorrect to suggest that we have already done so for purposes of defining regulatory takings. To the contrary, for over 30 years, we have attempted to define regulatory takings in a manner that is consistent with federal law. Unfortunately, for many years, federal regulatory

takings cases were complex and occasionally inconsistent, making our task

extremely challenging and giving the inaccurate impression that this court was

attempting to set forth a Washington-specific doctrine based on independent state

law.

      a.     Our pre-*Manufactured Housing* cases did not define regulatory
                takings based on independent state law

Although we have never defined regulatory takings based on independent

state law, our precedent may appear to have done so. *See, e.g., Laurel Park Cmty.,*

*LLC v. City of Tumwater*, 698 F.3d 1180, 1191-93 (9th Cir. 2012) (analyzing state

regulatory takings claim separately from federal regulatory takings claim); *Lemire*

*v. Dep't of Ecology*, 178 Wn.2d 227, 242, 309 P.3d 395 (2013) ("The parties and

amici strenuously debate the framework on which this court should rest a taking

analysis, including whether and to what extent our state constitutional takings

provision may offer greater protection than its federal counterpart."); Roger D.

Wynne, *The Path out of Washington's Takings Quagmire: The Case for Adopting*

*the Federal Takings Analysis*, 86 WASH. L. REV. 125, 136 (2011) (pointing to

"three unique elements" of Washington takings law). Regrettably, this court has

added to the confusion by occasionally characterizing our cases as setting forth a

"state 'regulatory takings' doctrine." *Robinson*, 119 Wn.2d at 47. We resolve this

confusion now.

The reason our precedent appears unusual is because this court was attempting to set forth "a doctrinally consistent, definitive test" for regulatory takings, which "has proved an elusive goal, sometimes characterized as 'the lawyer's equivalent of the physicist's hunt for the quark.'" *Orion Corp.*, 109 Wn.2d at 645 (internal quotation marks omitted) (quoting *Williamson County Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 199 n.17, 105 S. Ct. 3108, 87 L. Ed. 2d 126 (1985), *overruled in part by Knick v. Township of Scott*, 588 U.S. ___, 139 S. Ct. 2162, 204 L. Ed. 2d 558 (2019)). It should not be surprising that our pursuit of such an elusive goal left this court as something of an outlier. However, our attempts to articulate a test for when regulations cross the line into regulatory takings have always attempted to achieve consistency with federal law, not to set forth an independent state law doctrine.

Achieving consistency with federal regulatory takings law proved difficult due to "unresolved tensions between divergent lines of authority." *Id.* Even though the United States Supreme Court held in 1922 that a police power regulation becomes a taking if it goes too far, the United States Supreme Court (and this court, following its lead) continued to state that "an exercise of the police power protective of the public health, safety, or welfare *cannot* be a taking requiring compensation." *Id.* at 646 (emphasis added) (citing *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 107 S. Ct. 1232, 94 L. Ed. 2d 472

12

(1987); *Miller v. Schoene*, 276 U.S. 272, 48 S. Ct. 246, 72 L. Ed. 568 (1928);

*Mugler v. Kansas*, 123 U.S. 623, 8 S. Ct. 273, 31 L. Ed. 205 (1897); *Cougar Bus.*

*Owners Ass'n v. State*, 97 Wn.2d 466, 647 P.2d 481 (1982); *Markham Advert. Co.*

*v. State*, 73 Wn.2d 405, 427, 439 P.2d 248 (1968)). Thus, it appeared that some

regulations of private property were categorically incapable of being regulatory

takings, but it was not clear which ones.

Moreover, regulatory takings cases suffered from a "doctrinal blurring that

has occurred between due process and regulatory takings." *Id.* at 647. Federal and

state cases held that "a police power action must be reasonably necessary to serve a

legitimate state interest" to survive a substantive due process challenge. *Id.* at 646-

47 (citing *Goldblatt v. Town of Hempstead*, 369 U.S. 590, 594-95, 82 S. Ct. 987, 8

L. Ed. 2d 130 (1962); *Lawton v. Steele*, 152 U.S. 133, 137, 14 S. Ct. 499, 38 L. Ed.

385 (1894); *W. Main Assocs. v. City of Bellevue*, 106 Wn.2d 47, 52, 720 P.2d 782

(1986); *Cougar Bus. Owners*, 97 Wn.2d at 476). Meanwhile, "[a] regulatory

taking also hinges on whether the challenged regulation is 'reasonably necessary to

the effectuation of a substantial public purpose,' or 'does not substantially advance

legitimate state interests.'" *Id.* at 647 (citation omitted) (internal quotation marks

omitted) (quoting *Penn Central*, 438 U.S. at 127; *Keystone*, 480 U.S. at 485). It

was thus difficult to determine whether and to what extent substantive due process

principles were relevant to the regulatory takings analysis.

As a result of such confusion, courts were left to determine when a regulation crosses the line into a regulatory taking based on "'essentially ad hoc, factual inquiries.'" *Keystone*, 480 U.S. at 495 (internal quotation marks omitted) (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S. Ct. 383, 62 L. Ed. 2d 332 (1979)). In an effort to bring some uniformity to the regulatory takings analysis, this court "ventur[ed] where other courts had feared to go, [and] began the painful process of developing coherent legal doctrine to supplant vague or nonexistent principles and intuitive determinations." Richard L. Settle, *Regulatory Taking Doctrine in Washington: Now You See It, Now You Don't*, 12 U. PUGET SOUND L. REV. 339, 341 (1989). After revising and clarifying our analysis several times, we ultimately settled on the following multistep test:



*Margola*, 121 Wn.2d at 643-46; *Guimont*, 121 Wn.2d at 598-604; *see also*

*Robinson*, 119 Wn.2d 34; *Sintra*, 119 Wn.2d 1; *Presbytery*, 114 Wn.2d 320; *Orion*

*Corp.*, 109 Wn.2d 621.

By the time we settled on this framework in 1993, it had been suggested that

our test was "undermined by language in *Lucas* questioning harm versus benefit

analysis." *Guimont*, 121 Wn.2d at 603 n.5. However, we declined to address that issue because "it would be premature to begin dismantling our takings framework, carefully crafted in *Presbytery*, *Sintra*, and *Robinson*, without more definitive guidance on this issue from the United States Supreme Court." *Id.*

While we continued to await more definitive guidance, this court decided *Manufactured Housing*, which forms the basis of the plaintiffs' regulatory takings claim in this case.

      b.    *Manufactured Housing* did not define regulatory takings based on independent state law

*Manufactured Housing*'s lead opinion cited only *Presbytery* to support its holding that a regulation is "subject to a categorical 'facial' taking challenge" when it "destroys one or more of the fundamental attributes of ownership (the right to possess, exclude others and to dispose of property)."[2] *Mfd. Hous.*, 142 Wn.2d at 355. The plaintiffs and allied amici contend that this category of per se regulatory takings is based on independent state law and therefore cannot be disavowed unless it is shown to be both incorrect and harmful. We clarify that this category of per se regulatory takings is not based on independent state law.

---

[2] The dissents challenged this holding as an incorrect application of *Presbytery*. *Mfd. Hous.*, 142 Wn.2d at 388 (Johnson, J., dissenting), 407-08 (Talmadge, J., dissenting). However, because we hold that *Manufactured Housing*'s legal underpinnings have disappeared, we assume without deciding that it correctly applied *Presbytery*. We also assume without deciding that *Manufactured Housing*'s lead opinion was joined by a majority of the court on the issues relevant to this case and that the facts of *Manufactured Housing* are not materially distinguishable from the facts presented here.

*Presbytery* unambiguously applied *"the* 'taking' analysis used by the United

States Supreme Court and by this court," drawing no distinction between the two.

114 Wn.2d at 333 (emphasis added). *Presbytery*'s approach was entirely

consistent with our prior explicit holding that "we will apply the federal analysis to

review all regulatory takings claims." *Orion Corp.*, 109 Wn.2d at 658; *see also*

*Margola Assocs.*, 121 Wn.2d at 642 n.6; *Guimont*, 121 Wn.2d at 604. Thus, by

relying solely on *Presbytery* to define a per se regulatory taking, *Manufactured*

*Housing* necessarily relied on federal law.

Furthermore, when applying its definition to the facts presented,

*Manufactured Housing*'s lead opinion cited *Presbytery* again, along with other

Washington cases, federal cases, and cases from other states. *Mfd. Hous.*, 142

Wn.2d at 364-68. Thus, it is clear from the range of authorities cited in

*Manufactured Housing*'s lead opinion that its definition of a per se regulatory

taking was not based on independent state law but on an attempt to apply federal

law and, perhaps, to discern a national consensus.

It may appear that *Manufactured Housing* was applying a Washington-

specific definition of regulatory takings because the lead opinion included a

*Gunwall*[3] analysis. *Id.* at 356-61. However, the *Gunwall* analysis was unrelated to

the definition of regulatory takings. Instead, "[w]hat is key is article I, section 16's

---

[3] *State v. Gunwall*, 106 Wn.2d 54, 61-62, 720 P.2d 808 (1986).

absolute prohibition against taking private property for private use." *Id.* at 357. The court therefore concluded that the Washington State Constitution is more protective than the federal constitution on the basis "that 'private use' under amended article I, section 16 is defined more literally than under the Fifth Amendment, and that Washington's interpretation of 'public use' has been more restrictive." *Id.* at 361. Nevertheless, the conclusion that article I, section 16 defines public and private use more protectively than the federal constitution does not also establish that article I, section 16 has a more protective definition of regulatory takings. Those are two separate questions implicating two different parts of the regulatory takings analysis.

Regulatory takings cases involve a "remedial question of how compensation is measured once a regulatory taking is established" and "the quite different and logically prior question whether the . . . regulation at issue had in fact constituted a taking." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 328, 122 S. Ct. 1465, 152 L. Ed. 2d 517 (2002). The definition of a regulatory taking goes only to the initial determination of whether "'property' has actually been taken." *Mfd. Hous.*, 142 Wn.2d at 363-64. Meanwhile, the public/private use distinction goes only to the appropriate remedy once a taking has been established—compensation or invalidation. *See id.* at 362.

Thus, none of our cases, including *Manufactured Housing*, defined regulatory takings based on independent state law. Instead, we have always tried to ascertain and apply a definition that is consistent with federal law. Our regulatory takings cases appear state-specific only because, for many years, the federal definition was difficult to understand. The United States Supreme Court has since provided definitive guidance on that issue, which "[a]n overwhelming majority of states" have followed. *Phillips v. Montgomery County*, 442 S.W.3d 233, 240 (Tenn. 2014). We now do the same.

2. The legal underpinnings of our definition of regulatory takings have disappeared

Because our prior definition of regulatory takings was not based on independent state law, we need not decide whether it is incorrect and harmful. Instead, "we can reconsider our precedent not only when it has been shown to be incorrect and harmful but also when the legal underpinnings of our precedent have changed or disappeared altogether." *W.G. Clark*, 180 Wn.2d at 66. We do so now because two United States Supreme Court cases decided after *Manufactured Housing* establish that the federal legal underpinnings of our precedent have disappeared, and it has not been shown that there is a principled basis on which to depart from federal law at this time.

First, in 2002, the United States Supreme Court held that categorical rules are rarely appropriate in regulatory takings cases. *Tahoe-Sierra*, 535 U.S. 302.

The regulations at issue in *Tahoe-Sierra* were two temporary development moratoria "that, *while in effect*, denie[d] a property owner all viable economic use of her property." *Id.* at 320 (emphasis added). A number of property owners brought a facial takings claim, arguing that the regulations "g[ave] rise to an unqualified constitutional obligation to compensate [them] for the value of its use during that period." *Id.*

The United States Supreme Court rejected their claim, cautioning that "we still resist the temptation to adopt *per se* rules in our cases involving partial regulatory takings." *Id.* at 326. Instead, categorical rules for regulatory takings claims are appropriate only in an "'extraordinary circumstance,'" such as when a *permanent* regulation provides that "'*no* productive or economically beneficial use of land is permitted.'" *Id.* at 330 (quoting *Lucas*, 505 U.S. at 1017).

In such extraordinary circumstances, there is no need for a case-specific inquiry because the regulation will "*always* force individuals to bear a special burden that should be shared by the public as a whole." *Id.* at 341 (emphasis added). However, absent extraordinary circumstances, "the default rule remains that, in the regulatory taking context, we require a more fact specific inquiry." *Id.* at 332. To determine whether there were extraordinary circumstances requiring a categorical rule, *Tahoe-Sierra* considered "the concepts of 'fairness and justice'

that underlie the Takings Clause" and held that the temporary moratoria at issue could not be deemed per se regulatory takings. *Id.* at 334.

*Tahoe-Sierra* thus deeply undermines *Manufactured Housing*'s view that a categorical rule is appropriate whenever a property owner is deprived of any part of "the 'bundle of sticks' representing the valuable incidents of ownership." *Mfd. Hous.*, 142 Wn.2d at 366. Instead, according to *Tahoe-Sierra*, categorical rules for regulatory takings claims are appropriate only in extraordinary circumstances.

It is unlikely that *Tahoe-Sierra* would recognize extraordinary circumstances are present whenever a regulation limits "the right to choose to whom one will rent their property." Resp'ts' Br. at 1. If that were so, every antidiscrimination law that prohibits a landlord from rejecting a tenant based on protected characteristics would be a per se regulatory taking requiring either compensation or invalidation. *E.g.*, RCW 49.60.222(1)(f); SMC 14.08.040(A). *Tahoe-Sierra* would likely not allow such a holding because it "would render routine government processes prohibitively expensive," if not impossible. 535 U.S. at 335.

Although *Tahoe-Sierra* cautioned that categorical rules are rarely appropriate in regulatory takings cases, it left open the question of when regulations present such extraordinary circumstances that categorical rules are appropriate. That question was resolved in 2005, when *Chevron U.S.A.* definitively held that there are only "two relatively narrow categories" of

"regulatory action that generally will be deemed *per se* takings for Fifth Amendment purposes." 544 U.S. at 538.

One per se category applies "where government requires an owner to suffer a permanent physical invasion of her property." *Id.* The other "applies to regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her property." *Id.* (alteration in original) (quoting *Lucas*, 505 U.S. at 1019). Any other alleged regulatory taking must be analyzed on a case-by-case basis according to the *Penn Central* factors. *Id.* at 538-39. The United States Supreme Court has since consistently applied these standards when defining regulatory takings, such that *Chevron U.S.A.* is clearly the Court's final, definitive statement on this issue at this time. *See Murr v. Wisconsin*, 582 U.S. ___, 137 S. Ct. 1933, 1942-43, 198 L. Ed. 2d 497 (2017); *Horne v. Dep't of Agric.*, 576 U.S. ___, 135 S. Ct. 2419, 2429, 192 L. Ed. 2d 388 (2015); *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 31-32, 133 S. Ct. 511, 184 L. Ed. 2d 417 (2012); *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702, 713, 130 S. Ct. 2592, 177 L. Ed. 2d 184 (2010) (partial plurality opinion).

*Chevron U.S.A.* narrowly defines per se regulatory takings that trigger categorical rules. By contrast, *Manufactured Housing*'s definition of per se regulatory takings broadly applies a categorical rule to any regulation that destroys any fundamental attribute of ownership. *Tahoe-Sierra* strongly indicates such a

categorical rule would be rejected by the United States Supreme Court and *Chevron U.S.A.* confirms it. Therefore, *Manufactured Housing*'s definition of per se regulatory takings is no longer a valid application of the federal law on which it was based. And because it has not been shown that we should now depart from the federal definition of regulatory takings as a matter of independent state law, we disavow *Manufactured Housing*'s definition.[4]

In addition, *Chevron U.S.A.* clarified the *Penn Central* factors for evaluating partial regulatory takings claims that do not fit within either per se category. Those factors are intended to shed light on "the *magnitude or character of the burden* a particular regulation imposes upon private property rights" and to provide "information about how any regulatory burden is *distributed* among property owners." *Id.* at 542. The factors explicitly do not ask "whether a regulation of private property is *effective* in achieving some legitimate public purpose." *Id.*

By contrast, our prior regulatory takings cases allow a regulation to be "insulated from a 'takings' challenge" if it "protects the public from harm" and require courts to consider whether the challenged "regulation substantially

---

[4] Some amici appear to contend that we should now adopt *Manufactured Housing*'s definition of per se regulatory takings as a matter of independent state law. However, amici's arguments are all based on Washington's more protective definitions of public and private uses, which, as discussed above, are relevant only to the appropriate remedy once a taking has been established. No party or amicus performs a *Gunwall* analysis or provides any other principled basis on which to define regulatory takings broadly as a matter of independent state law. *See Gunwall*, 106 Wn.2d 54. We therefore decline to do so.

advances legitimate state interests." *Presbytery*, 114 Wn.2d at 330, 333; *see also Margola Assocs.*, 121 Wn.2d at 645-46; *Guimont*, 121 Wn.2d at 603-04; *Robinson*, 119 Wn.2d at 49-50; *Sintra*, 119 Wn.2d at 14-17; *Orion Corp.*, 109 Wn.2d at 658. That precedent can no longer be valid because it may provide *less* protection for private property rights than the federal constitution does. *See Orion Corp.*, 109 Wn.2d at 652, 657-58.

In sum, today we continue our long-standing practice of following federal law in defining regulatory takings and explicitly adopt the definition set forth in *Chevron U.S.A.* Pursuant to *Chevron U.S.A.*, there are only two categories of per se regulatory takings: (1) "where government requires an owner to suffer a permanent physical invasion of her property" and (2) "regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her property." 544 U.S. at 538 (alteration in original) (quoting *Lucas*, 505 U.S. at 1019). If an alleged regulatory taking does not fit into either category, it must be considered on a case-by-case basis in accordance with the *Penn Central* factors. *Id.* at 538-39.

3. The plaintiffs do not show that the FIT rule facially effects a regulatory taking

The plaintiffs do not argue that the FIT rule fits into either of the per se categories set forth in *Chevron U.S.A.*, and it clearly does not. On its face, the FIT rule does not require any property owners to suffer any permanent physical invasion of their properties, and the plaintiffs do not contend that the FIT rule

deprives them of *any* economically beneficial uses of their properties, let alone *every* economically beneficial use. The plaintiffs also do not contend that the FIT rule is a regulatory taking pursuant to the *Penn Central* factors.[5] We therefore reverse the trial court and hold that the plaintiffs have not shown the FIT rule facially effects a regulatory taking of their property.

B.     Because the plaintiffs have not shown that the FIT rule effects a taking, we do not reach the issue of whether it is for private use

The plaintiffs contend that the regulatory taking effected by the FIT rule is for private use, rather than public use, and is therefore invalid. Because we hold that the plaintiffs do not show the FIT rule effects a taking at all, we decline to consider the public/private use distinction. As discussed above, that distinction is relevant only to the appropriate remedy where a taking has been shown, and no taking has been shown here.

C.     The FIT rule does not facially violate substantive due process

The plaintiffs next claim that the FIT rule facially violates their article I, section 3 right to substantive due process, contending that the FIT rule is subject to heightened scrutiny because it regulates a fundamental attribute of property ownership. We hold that the applicable standard is rational basis review, which the FIT rule survives.

---

[5] We express no opinion on whether application of the *Penn Central* factors would show that the FIT rule effects a regulatory taking as applied to any particular property.

25

1.    The FIT rule is subject to rational basis review

As discussed in more detail in our opinion in *Yim* II, we have never held that independent state law requires a heightened standard of review for substantive due process challenges to laws regulating the use of property. Instead, we have always looked to federal law to discern the appropriate standard of review, and it has not been shown that we should adopt a heightened standard now as a matter of independent state law. We therefore hold that the plaintiffs' article I, section 3 substantive due process claim is subject to the same standard that would apply if their claims were based on the due process clauses of the Fifth and Fourteenth Amendments. That standard is rational basis review.

We recognize that some United States Supreme Court precedent might suggest heightened scrutiny is required by stating that laws regulating the use of property must not be "'unduly oppressive'" on the property owner, or must have a "'substantial relation'" to a legitimate government purpose. *Goldblatt*, 369 U.S. at 595 (quoting *Lawton*, 152 U.S. at 137); *Nectow v. City of Cambridge*, 277 U.S. 183, 187, 48 S. Ct. 447, 72 L. Ed. 842 (1928) (quoting *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395, 47 S. Ct. 114, 71 L. Ed. 303 (1926)). However, the United States Supreme Court does not interpret this language as requiring heightened scrutiny. Instead, the "unduly oppressive" test has been interpreted as "applying a deferential 'reasonableness' standard." *Chevron U.S.A.*, 544 U.S. at

541 (internal quotation marks omitted) (citing and quoting *Goldblatt*, 369 U.S. at 594-95; *Lawton*, 152 U.S. at 137). Likewise, it has long been acknowledged that "the use of property and the making of contracts are normally matters of private and not of public concern," but "[e]qually fundamental with the private right is that of the public to regulate it in the common interest." *Nebbia v. New York*, 291 U.S. 502, 523, 54 S. Ct. 505, 78 L. Ed. 940 (1934).

Therefore, a law regulating the use of property violates substantive due process only if it "fails to serve any legitimate governmental objective," making it "arbitrary or irrational." *Chevron U.S.A.*, 544 U.S. at 542; *see also Kentner v. City of Sanibel*, 750 F.3d 1274, 1280-81 (11th Cir. 2014), *cert. denied*, 135 S. Ct. 950 (2015); *Samson v. City of Bainbridge Island*, 683 F.3d 1051, 1058 (9th Cir.), *cert. denied*, 568 U.S. 1041 (2012). This test corresponds to rational basis review, which requires only that "the challenged law must be rationally related to a legitimate state interest." *Amunrud*, 158 Wn.2d at 222. We therefore apply rational basis review to the plaintiffs' substantive due process challenge to the FIT rule.[6]

---

[6] Appended to our opinion in *Yim* II is a nonexclusive list of this court's precedent that can no longer be interpreted as requiring heightened scrutiny in substantive due process challenges to laws regulating the use of property.

2. The FIT rule survives rational basis review on its face

Rational basis review requires that "the challenged law must be rationally related to a legitimate state interest." *Id.* Rational basis review is highly deferential because "a court may assume the existence of any necessary state of facts which it can reasonably conceive in determining whether a rational relationship exists between the challenged law and a legitimate state interest." *Id.*

The purpose of the FIT rule is to mitigate the impact of implicit bias in tenancy decisions. The plaintiffs appear to suggest this is not a legitimate government interest because "implicit bias can be both positive and negative." Resp'ts' Br. at 41. However, the fact that implicit bias may work to some people's advantage some of the time does not mean that mitigating its impact is an illegitimate purpose. Indeed, this court has recognized the importance of mitigating implicit bias in the context of jury selection with the enactment of GR 37. The plaintiffs do not show that implicit bias must be allowed to continue in the rental housing context.

The FIT rule's requirements are also rationally related to achieving its purpose. A rational person could believe that implicit bias will be mitigated by requiring landlords to offer tenancy to the first qualified applicant, rather than giving landlords discretion to reject an otherwise-qualified applicant based on a "gut check." Verbatim Report of Proceedings (Feb. 23, 2018) at 36. It is precisely

28

in such gut-check decisions where implicit bias is most likely to have influence because bias is "often unintentional, institutional, or unconscious." *State v. Saintcalle*, 178 Wn.2d 34, 36, 309 P.3d 326 (2013) (plurality opinion), *abrogated on other grounds by City of Seattle v. Erickson*, 188 Wn.2d 721, 398 P.3d 1124 (2017).

Indeed, the FIT rule's requirements are based on best practices recommended by industry associations, who advise that "[u]sing a set criteria also helps show that you are screening all applicants alike and can help avoid claims of discrimination by applicants not granted tenancy." CP at 315. Landlords are therefore advised to offer tenancy to the first qualified applicant "as a *best practice* when confronted with multiple, equally valid applications as a 'tie breaker.'" Br. of Amicus Curiae Rental Hous. Ass'n of Wash. at 3. Appearing as amici, several rental housing associations emphatically state that they do *not* support the FIT rule. Nevertheless, the procedures required by the FIT rule are consistent with industry-recommended best practices. Amici object only to making those practices mandatory, contending that doing so is unwise and will prove ineffective.

Rational basis review does not invite a demanding inquiry by this court into whether the FIT rule is good policy. Instead, our task is limited to deciding whether mandating industry-recommended best practices for avoiding

29

discrimination in tenancy decisions is rationally related to reducing the influence of implicit bias in tenancy decisions. The answer is clearly yes.

The plaintiffs further suggest that the FIT rule fails rational basis review because it is overbroad, given that "non-legal approaches" could be used instead and the FIT rule applies "even where a protected class is not among the landlords' applicant pool." Resp'ts' Br. at 41. However, "[t]he overbreadth doctrine may not be employed unless First Amendment activities are within the scope of the challenged enactment." *City of Seattle v. Montana*, 129 Wn.2d 583, 598, 919 P.2d 1218 (1996) (plurality opinion); U.S. CONST. amend. I. Thus, any assertion of overbreadth is irrelevant to the plaintiffs' facial substantive due process claim. The plaintiffs' free speech claim is addressed separately below.

It may well be that the FIT rule will prove ineffective or unwise as a matter of policy. However, the plaintiffs do not carry their "'heavy burden'" of showing that it facially violates substantive due process as a matter of law. *Amunrud*, 158 Wn.2d at 215 (quoting *Larson v. Seattle Popular Monorail Auth.*, 156 Wn.2d 752, 757, 131 P.3d 892 (2006)). We therefore reverse the trial court and hold that the FIT rule survives rational basis review on its face.

D.    The FIT rule does not facially violate free speech rights

Finally, the plaintiffs claim that the FIT rule facially violates their article I, section 5 right to free speech. It is undisputed that the speech at issue here

30

(advertisements for vacant tenancies) is "commercial speech," that is, "'speech proposing a commercial transaction.'" *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 637, 105 S. Ct. 2265, 85 L. Ed. 2d 652 (1985) (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455-56, 98 S. Ct. 1912, 56 L. Ed. 2d 444 (1978)). It is also undisputed that article I, section 5 and the First Amendment provide identical protections for commercial speech. *Bradburn v. N. Cent. Reg'l Library Dist.*, 168 Wn.2d 789, 800, 231 P.3d 166 (2010).

The main focus of the parties' dispute is the level of scrutiny that we must apply to the FIT rule. The trial court agreed with the plaintiffs that the FIT rule is subject to intermediate scrutiny and "cannot survive." CP at 520. We reverse. The FIT rule is subject to, and survives, deferential scrutiny.

1.      The FIT rule is subject to deferential scrutiny

"'[C]ommercial speech' is entitled to the protection of the First Amendment, albeit to protection somewhat less extensive than that afforded 'noncommercial speech.'" *Zauderer*, 471 U.S. at 637. The level of scrutiny applied to laws governing commercial speech depends on whether the law at issue actually restricts commercial speech or merely requires commercial speakers to include factual disclosures. *Id.* at 650.

Where a law restricts truthful commercial speech proposing a lawful transaction, the law is subject to intermediate scrutiny. *Cent. Hudson Gas & Elec.*

*Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 564, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980). Meanwhile, if the law merely requires factual disclosures by commercial speakers, review is deferential because a person's "constitutionally protected interest in *not* providing any particular factual information in his advertising is minimal." *Zauderer*, 471 U.S. at 651. Therefore, "an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Id.* The government has the burden of proving its disclosure requirements are "neither unjustified nor unduly burdensome." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. ___, 138 S. Ct. 2361, 2377, 201 L. Ed. 2d 835 (2018) (*NIFLA*).

The plaintiffs contend that the FIT rule is a restriction on their commercial speech because the FIT rule provides that "[l]andlords cannot decline to communicate a minimum threshold or communicate a flexible standard and then weigh the credit history against other positive or negative factors in the application." Resp'ts' Br. at 43. Nothing in the text of the FIT rule supports the plaintiffs' contention.

Washington law already provides that "[p]rior to obtaining any information about a prospective tenant, the prospective landlord shall first notify the prospective tenant" of the "types of information [that] will be accessed to conduct the tenant screening" and "[w]hat criteria may result in denial of the application."

RCW 59.18.257(1)(a)(i)-(ii). The validity of that statute is not challenged here. The FIT rule merely provides that if property owners have additional rental criteria beyond what may result in a denial, they must "at the same time" give prospective tenants notice of what those criteria are and how they may be met. SMC 14.08.050(A)(1).

On its face, the FIT rule does not impose any restrictions on what the landlord's additional criteria may be or how they must be worded, and, contrary to the trial court's finding, it does not facially preclude advertisements for vacant tenancies from including phrases such as "'call to learn how to apply' or 'email me for further details.'" CP at 518. If the FIT rule is interpreted to impose such restrictions in the future, a property owner may bring an as-applied challenge that might be subject to heightened scrutiny. However, on its face, the FIT rule requires only that landlords disclose factual information about their own rental criteria. It is therefore subject to deferential scrutiny in accordance with *Zauderer*.

2.    The FIT rule survives deferential scrutiny

The plaintiffs analyze their free speech claim only in accordance with intermediate scrutiny. However, it is still the City's burden to prove that the FIT rule survives deferential scrutiny. *NIFLA*, 138 S. Ct. at 2377. We hold the City has met its burden because on its face, the FIT rule is a justified disclosure requirement that does not unduly burden the plaintiffs' free speech rights.

To prove that the FIT rule is justified, the City must show that it addresses "a harm that is 'potentially real not purely hypothetical.'" *Id.* (quoting *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation*, 512 U.S. 136, 146, 114 S. Ct. 2084, 129 L. Ed. 2d 118 (1994)). The City has shown that the problem of implicit bias in Seattle's rental housing market is (at least) potentially real, based on a 2014 study that "showed evidence of differential treatment in over 60% of the tests" based on "race, national origin, sexual orientation and gender identity." City of Seattle's Opening Br. at 7; CP at 57. This differential treatment included subjecting different applicants to different rental criteria:

> African American and Latino testers were told about criminal background and credit history checks more frequently than the white testers. They also were asked more often about their spouses' employment history (especially with Latino testers). They also were shown and told about fewer amenities, provided fewer applications and brochures, were shown fewer vacant units. In some cases, the prices quoted were higher for the same unit.
>
> Testers for sexual orientation and gender identity were shown fewer amenities, provided fewer applications and brochures, and were shown fewer vacant units. In some cases, the prices quoted were higher for the same unit.

CP at 57. This is sufficient justification for the FIT rule's enactment.

To prove that the FIT rule does not "unduly burden[ ] protected speech," the City must show that it does not impose "a government-scripted, speaker-based disclosure requirement that is wholly disconnected from [the City]'s informational interest." *NIFLA*, 138 S. Ct. at 2377. It clearly does not. The landlords are

34

required to disclose only the rental criteria they set for themselves, so the FIT rule does not impose any type of script. In addition, requiring landlords to disclose their rental criteria is directly connected to the City's interest in ensuring that the same rental criteria are applied to all applicants rather than subjecting some applicants to more demanding criteria due to the influence of implicit bias.

We therefore reverse the trial court and hold that the FIT rule survives deferential scrutiny on its face.

## CONCLUSION

The FIT rule is unquestionably an experiment. This is clear from the rule itself, which requires "the City Auditor to conduct an evaluation of the impact of the program described in subsections 14.08.050.A-C to determine if the program should be maintained, amended, or repealed." SMC 14.08.050(D). There is room for substantial debate about whether such an experiment is likely to succeed. However, the plaintiffs' facial challenges ask only whether the FIT rule is an experiment that Seattle is constitutionally prohibited from conducting. It is not.

We clarify that Washington courts have always attempted to define regulatory takings consistently with federal law, and we continue to do so now. Therefore, we adopt the definition of regulatory takings set forth in *Chevron U.S.A.* for purposes of article I, section 16 and hold that the plaintiffs have not met their burden of showing the FIT rule facially meets this definition. We also clarify that

rational basis review applies in substantive due process challenges to laws regulating the use of property and hold that the plaintiffs have not met their burden of proving that the FIT rule fails rational basis review on its face. Finally, we hold that on its face, the FIT rule requires only factual disclosures and the City has met its burden of showing the FIT rule survives deferential scrutiny.

We therefore reverse the trial court and remand with instructions to grant the City's motion for summary judgment.

Yim, J.
_____

WE CONCUR:

Fairhurst, C.J.
_____

_____

Madsen, J.
_____

Owens, J.
_____

Stephens, J.
_____

Wiggins, J.
_____

González, J.
_____

Gordon McCloud, J.
_____