IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | |
|---|---|
| HANA YOHANNES, | No. 82988-2-I |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| WILLIAM PEARSON, | |
| Appellant. | |

BOWMAN, J. — William Pearson appeals from a domestic violence protection order (DVPO) protecting his former girlfriend, Hana Yohannes, and a related order to surrender weapons. Substantial evidence supports the trial court's determinations that Pearson committed domestic violence and represented a credible threat to Yohannes' physical safety, and Pearson fails to show the trial court abused its discretion in entering either the DVPO or the weapons surrender order. We affirm.

FACTS

On June 14, 2021, Yohannes petitioned for a DVPO protecting her from Pearson, her former boyfriend. In her sworn declarations below, Yohannes attested that Pearson began physically abusing her in December 2020, had "gotten worse over time," and would "punch, hit, or restrain" her if she "[went] against any of his wishes." She said that in January 2021, she told Pearson she was "breaking up with him" after an incident during which Pearson screamed at

her and threw a sheet at her head out of anger. But they still shared the residence. So, "[g]iven that it was [her] bed in the master bedroom and [Pearson's bed] in the office/guest bedroom, [she] asked that [Pearson] sleep in his own bed while [they] figure[d] this out."

Yohannes said that on April 15, 2021, she threatened to tell Pearson's family and friends that they had broken up. According to Yohannes, Pearson argued with her, called her demeaning names, yelled at her, and "hit" her. Yohannes "feared for her safety" and began recording the incident on her cell phone. She provided a hyperlink to a YouTube website purportedly containing a video of Pearson "calling [her] names and punching [her]."

Yohannes attested that on May 30, 2021, Pearson slapped her after finding out she had kissed someone. "[A]s punishment," Pearson "began sleeping in [Yohannes'] bedroom each night, despite [her] asking him to sleep in his own." Each night for the next two weeks, Pearson "refused to leave and [she] had to either uncomfortably share [her] bed with him, sleep on his bed in the other room, or sleep on the couch." She said that if she slept in her bed, Pearson engaged in "unwanted touching," and if she asked him to stop, he would respond, " '[W]ell, deal with it.' " If she asked him to leave the bedroom, "he would scream in [her] face, hit [her], and one night he began to suffocate [her]." She was "only able to get him to stop punching . . . and suffocating [her] by keeping 911 dialed on [her] phone and telling him [she] would press 'call.' "

Yohannes attested that on the night of June 13, 2021, she locked her bedroom door "to protect [her]self from [Pearson]," and when he realized she

2

locked the door, he "began to violently shake [the] door and yell at [Yohannes] to let him in." According to Yohannes, Pearson "said things such as 'it's my fucking room, you dumb bitch,' " and " 'should I go get the drill.' " After Yohannes pleaded with him to stop, Pearson said, " '[O]r what' " and, " '[Y]ou're gonna do what you're gonna do, and I'm gonna do what I'm gonna do and we'll just see what happens, huh.' " Yohannes said that she "was terrified about what would happen" if Pearson entered the room and that she was able to contact two of her friends, who came to the upstairs apartment and escorted her out. Yohannes included a hyperlink to YouTube purportedly containing a video of Pearson "violently attempting to enter [her] bedroom and threatening [her] with a drill."

Pearson filed a declaration in opposition to Yohannes' petition and denied the allegations of abuse. He attested that while the couple had "normal, non-physical disputes in December of 2020," there was no domestic violence. Pearson said that in January 2021, the parties discussed breaking up but remained in a "roommate with benefits type situation."

As for the May 30, 2021 incident, Pearson attested that he and Yohannes were lying in bed and began to get intimate when Yohannes disclosed that "she made out with someone else." He said that his first reaction was to raise his voice and express displeasure, but he denied slapping Yohannes.

Pearson attested that after the May 30 incident, "things got murky." Both he and Yohannes wanted the master bedroom, and "[t]he only thing that escalated in the days leading up to the [June 14] petition were [Yohannes'] efforts to kick [Pearson] out of [the] shared bedroom." In response to Yohannes'

3

allegations that he would hit her when she asked him to leave the bedroom, Pearson claimed he was trying to sleep in the master bedroom when Yohannes "started to play loud music on her phone." Pearson "believe[d] [Yohannes] was purposefully trying to force [him] to leave the bedroom by making it impossible for [him] to sleep." According to Pearson, when Yohannes "saw that her loud music would not get [him] to leave the bedroom," she told him that if he did not leave, she would call the police and have him arrested for domestic violence. Pearson denied punching or hitting Yohannes, claiming that he had "done nothing but lay there."

As to the June 13, 2021 incident, Pearson claimed that "[w]hat really happened" was that Yohannes "locked herself in our shared bedroom." Pearson attested that "around midnight, [he] tried to enter the bedroom so that [he] could go to sleep." Finding the door locked, Pearson "became upset" and "started to shake the doorknob." According to Pearson, he "yelled through the door that it was [his] room and that [Yohannes] ha[d] no right to lock [him] out of it." He then "vigorously shook the doorknob, but seeing it was pointless, . . . decided to just stay near the door in case [Yohannes] changed her mind." Pearson attested that "[a]t one point, [he] remarked that the only way [he] would be able to get into the bedroom would be if [he] drilled the lock," and that around 12:30 a.m., he gave up and slept in another room. According to Pearson, "[a]t no point did [he] say or do anything that could be interpreted as a threat to [Yohannes] or her safety," and he "only wanted to go in our bedroom and sleep."

4

Yohannes' petition came before the trial court for a hearing in July 2021. Both parties gave sworn testimony. Yohannes, who appeared pro se, began by testifying that everything in her declarations remained true and correct. She then gave a prepared statement. In her statement, Yohannes testified that on June 13, 2021, the night she alleged Pearson was violently shaking the bedroom door after Yohannes had locked it, the "threats that [Pearson] made through the door and the shouting was terrifying." She said that "there was no doubt, in [her] mind, [Pearson] would be violent . . . if he made it into the bedroom," and that she "went on to the roof through [her] window but there was no way off."

Following Yohannes' statement, Pearson testified about his version of the events. Pearson's attorney asked, "I believe . . . [Yohannes] has submitted a video purportedly from April 15th of 2021." At that point, the trial court interjected, stating, "I wanted to just point out that I haven't viewed any video. . . . I haven't received or reviewed any video or audio recordings from either party." Pearson's attorney then said, "All right. I'll move on from that." On rebuttal, Yohannes sought to admit the two videos allegedly depicting Pearson's abuse, but the trial court declined to do so because Yohannes had not offered them in a form that the court could accept as evidence.

Yohannes also testified that she had a website for her business that Pearson "insisted that he pay for so he would have ownership and be able to make edits to the website on [Yohannes'] behalf." But after she served Pearson with the DVPO petition, Yohannes noticed that he had changed some pages on the website and "all of the text had gone white such that it couldn't be seen on

the white background." Yohannes testified that she asked through Pearson's attorney that Pearson make some changes to the website, and while he made some, he did not make all the changes. Yohannes then testified that she made a second request and did not hear back. So she requested that Pearson "hand over exclusive editing access to that website."

At the close of the hearing, the trial court found that "[b]ased on all of the evidence," Yohannes "has proven it is more likely than not that [Pearson] . . . has committed domestic violence." The court found Yohannes' testimony "to be credible," that "there has been a history of physical assault," and "that [Yohannes] feared imminent harm, which is also a basis . . . for the court to grant the protection order." The court further found that Pearson "represents a credible threat to the physical safety of [Yohannes]."

The court granted Yohannes' petition and entered a one-year DVPO directing, among other things, that Yohannes "shall have exclusive use and access to the website created for [her] business." The court also entered a weapons surrender order directing Pearson to immediately surrender all firearms, other dangerous weapons, and concealed pistol licenses.

Pearson appeals.

ANALYSIS

Pearson raises several challenges to the DVPO and related weapons surrender order. None warrant reversal.

6

Standard of Review

We review a trial court's decision to grant or deny a DVPO for abuse of discretion. In re Parentage of T.W.J., 193 Wn. App. 1, 6, 367 P.3d 607 (2016). A trial court abuses its discretion by exercising it on untenable grounds or for untenable reasons or if its decision is manifestly unreasonable. Id. Where, as here, the trial court has weighed the evidence, our role is simply to determine whether substantial evidence supports the trial court's findings of fact and whether those findings support the conclusions of law. In re Marriage of Greene, 97 Wn. App. 708, 714, 986 P.2d 144 (1999). Substantial evidence is a quantum of evidence sufficient to persuade a rational and fair-minded person that a premise is true. Nguyen v. City of Seattle, 179 Wn. App. 155, 163, 317 P.3d 518 (2014).

Domestic Violence

Pearson first contends that we must reverse because the trial court erred in determining that he committed domestic violence. We disagree.

Chapter 26.50 RCW[1] authorizes the trial court to enter a DVPO based on a determination that domestic violence occurred. See RCW 26.50.030 (DVPO exists for protection "in cases of domestic violence"). "Domestic violence" includes "[p]hysical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury or assault" between parties who are living

---

[1] The legislature repealed chapter 26.50 RCW effective July 1, 2022 as part of legislation that reorganized various civil protection order statutes into a new chapter. See LAWS OF 2021, ch. 215, §§ 170(94)-(126), 1; see also chapter 7.105 RCW. Because that legislation was not yet in effect at the time of the proceedings below, we refer herein to the relevant, but since repealed, 2021 statutes as if still in effect.

together and have or have had a dating relationship.  RCW 26.50.010(3)(a),
(7)(d).

Here, as reflected in its oral ruling, the trial court determined that Pearson
had committed domestic violence based on both a finding of assault and a
finding that Pearson inflicted a fear of imminent physical harm.  Substantial
evidence supports these findings.  Yohannes testified under oath that Pearson
slapped her on May 30, 2021, and that one night in June when she asked him to
leave the bedroom, he struck her and began suffocating her.  And she described
Pearson screaming at her and hitting her if she told him to stop touching her
when they shared the bed.  Yohannes also testified that Pearson began
physically abusing her in December 2020, including hitting and restraining her,
and in January 2021, he screamed at her and threw a sheet at her head.
Yohannes' testimony, which the trial court expressly found credible, supports the
trial court's finding that Pearson assaulted Yohannes.  Cf. State v. Tyler, 138 Wn.
App. 120, 130, 155 P.3d 1002 (2007) (assault includes "an intentional touching or
striking of another person that is harmful or offensive, regardless of whether it
results in physical injury").

Yohannes also testified that on June 13, 2021, after she had locked
herself in the bedroom, Pearson violently shook the door and threatened to get a
drill.  She said that she had seen Pearson use a drill to open a locked door
before, that she had "no doubt" Pearson would be "violent" if he gained entry to
the bedroom, and that she was so "terrified" that she tried to escape through the
window.  This testimony, combined with the trial court's finding that Pearson had

assaulted Yohannes before, supports the trial court's finding that Pearson caused Yohannes to fear imminent physical harm.

Pearson disagrees and argues that Yohannes offered no photographic evidence and never called the police or filed a police report. Pearson denies slapping Yohannes in May 2021 and disputes Yohannes' characterization of the force with which he shook the bedroom door on June 13, 2021, i.e., "vigorously" and not "violently." He asserts Yohannes' claim that she tried to escape through the window "is likely an embellishment or exaggeration," and "[i]f it was a fear of . . . Pearson that drove her to try escaping out the window, then that same fear would have prevented her from returning inside." Pearson argues that Yohannes' testimony "amounts to nothing more than mere allegations" and is insufficient to support the trial court's findings.

But testimony is evidence, and "[t]he trier of facts, where the evidence is conflicting, may believe entirely the testimony of one party and disbelieve the testimony of the other party." Bland v. Mentor, 63 Wn.2d 150, 155, 385 P.2d 727 (1963). Also, in a substantial evidence review, "[w]e will not substitute our judgment for that of the trial court, even if we might have resolved the factual dispute differently." Nguyen, 179 Wn. App. at 163. Pearson essentially asks this court to set aside the trial court's determination that Yohannes' testimony was credible and reweigh the evidence in a manner more favorable to him. This we will not do. See Thompson v. Hanson, 142 Wn. App. 53, 60, 174 P.3d 120 (2007) ("An appellate court defers to the trier of fact for purposes of resolving

9

conflicting testimony and evaluating the persuasiveness of the evidence and credibility of the witnesses."), aff'd, 168 Wn.2d 738, 239 P.3d 537 (2009).

Pearson also contends that any harm Yohannes feared during the June 13, 2021 incident could not have been "imminent" because it was conditioned on him entering the bedroom, yet Yohannes had locked the door.  He asserts that "shaking of the bedroom doorknob (or door) while the door is locked is not enough to give rise to a fear of imminent harm," and that he could not get into the bedroom until after Yohannes left.  But a reasonable inference from Yohannes' testimony that Pearson was violently shaking the door is that he was attempting to open it.  Cf. State v. Living Essentials, LLC, 8 Wn. App. 2d 1, 14, 436 P.3d 857 (2019) (substantial evidence standard requires the court to view the evidence and reasonable inferences therefrom in the light most favorable to the party who prevailed below).  And as discussed, Yohannes also testified that Pearson threatened to get a drill, which Yohannes had seen Pearson use on another occasion to open a locked door.

The record supports the trial court's finding that Yohannes feared imminent physical harm.  In any case, the trial court also found that Pearson had assaulted Yohannes, a finding which alone supported entry of the DVPO, even without considering the additional finding that Pearson inflicted a fear of imminent physical harm.  See RCW 26.50.010(3)(a) (domestic violence includes assault "or" infliction of fear of imminent physical harm).

Next, Pearson contends that the videos Yohannes tried to admit contradicted her testimony.  But because the court did not admit the videos, the

record does not support Pearson's contention. To this end, Pearson also contends that because the trial court did not consider the videos, "the trial court should not have considered . . . Yohannes' testimony regarding the contents of said videos," including testimony about an incident that occurred on April 15, 2021. But Pearson points to nothing in the record to show the trial court relied on any testimony from Yohannes as to the contents of the excluded videos. And as much as Pearson is arguing that exclusion of the videos foreclosed Yohannes' testimony about her <u>personal recollection</u> of the events depicted, Pearson is incorrect.

Finally, Pearson contends:

> If the trial court . . . consider[ed] statements that . . . Yohannes alleges . . . Pearson made on the night of June 13[, 2021], then it was a violation of . . . Pearson's due process rights for the trial court to interrupt and shut down . . . Pearson's testimony regarding that night and the associated recording.

The record does not support Pearson's assertion that the trial court prevented him from testifying about the events of June 13, 2021. After the court informed Pearson's counsel that it had reviewed no video, Pearson's counsel said he would "move on from that" and "[g]iven that, . . . I have no other questions for . . . Pearson." Counsel then asked Pearson, "[I]s there anything I missed that you wish to testify to, based upon what you've heard today." Pearson began saying something about a "YouTube link for the recording from June 13th." It was then Pearson's counsel, not the trial court, who interjected to say, "[T]hat's not in evidence so you don't have to worry about that." Pearson responded, "All right, then, . . . I do not believe there is anything else."

11

Nothing in the record suggests that the trial court deprived Pearson of an opportunity to testify about the events of June 13, 2021, so his due process claim fails. Cf. Tellevik v. Real Prop. Known as 31641 W. Rutherford St. Located in the City of Carnation, Wash., 125 Wn.2d 364, 370-71, 884 P.2d 1319 (1984) ("[D]ue process generally affords an individual notice and an opportunity to be heard when the government deprives the individual of a life, liberty, or property interest.").

Because substantial evidence supports the trial court's findings and because its findings support the determination that Pearson committed domestic violence, the trial court did not err by entering the DVPO.

### Credible Threat

Pearson argues that the trial court erred in finding that he presents a credible threat to Yohannes and ordering him to surrender weapons.[2] Again, we disagree.

A trial court must enter an order to surrender weapons in connection with a DVPO if it finds that the respondent "represents a credible threat to the physical safety" of the individual protected by the DVPO. RCW 9.41.800(2)(c)(i).

Here, the trial court expressly found that Pearson "represents a credible threat to the physical safety of [Yohannes]." While Pearson asserts that the court

---

[2] Pearson asserts that the trial court's credible threat determination was a conclusion of law and not a finding of fact. He is incorrect. See RCW 9.41.800(2)(c)(i) (characterizing credible threat determination as a "finding"); see also Goodeill v. Madison Real Est., 191 Wn. App. 88, 99, 362 P.3d 302 (2015) (" 'If a determination concerns whether the evidence showed that something occurred or existed, it is properly labeled a finding of fact.' ") (quoting Moulden & Sons, Inc. v. Osaka Landscaping & Nursery, Inc., 21 Wn. App. 194, 197 n.5, 584 P.2d 968 (1978)).

needed to specify the "particular set of words and/or actions" that constituted a credible threat, he cites no authority to support such an assertion. See RAP 10.3(a)(6). And substantial evidence supports the trial court's credible threat finding. As discussed, Yohannes testified about multiple instances of assault by Pearson. Yohannes also testified that in the days leading up to her petitioning for a DVPO, Pearson insisted on sleeping in Yohannes' bed despite her asking him to sleep in his own, that Pearson would scream at and hit Yohannes if she asked him to leave, and that once, Pearson began to suffocate Yohannes, stopping only when she threatened to call 911.

Because substantial evidence supports the trial court's credible threat finding, and because RCW 9.41.800(2)(c)(i) obligates the trial court to enter the weapons surrender order once it made this finding, it did not err by doing so.

Website

As a final matter, Pearson contends that the trial court erred by ordering that Yohannes have exclusive use of and access to the website for her business. Pearson asserts that although a trial court entering a DVPO may provide for the possession and use of essential personal effects, i.e., "those items necessary for a person's immediate health, welfare, and livelihood,"[3] essential personal effects do not include "intangible personal property." But Pearson cites no authority to support this conclusory assertion, so we reject it. See RAP 10.3(a)(6).

In any case, a trial court entering a DVPO is authorized to "[o]rder other relief as it deems necessary for the protection of the petitioner." RCW

---

[3] RCW 26.50.010(5).

26.50.060(1)(f). Yohannes testified that after she served her DVPO petition on Pearson, she noticed changes to the website for her business, and that the changes to the website were "severely impacting [her] business." It is undisputed that Pearson had the ability to make—and undo—these changes. Yet when Yohannes asked Pearson to undo the changes to the website, he did not do so, despite Yohannes' multiple requests through Pearson's counsel. Under these circumstances, Pearson fails to persuade us that the trial court had no tenable basis for ordering that Yohannes have exclusive use of and access to the website.

Pearson also argues that the trial court's order with regard to the website amounted to an unconstitutional taking of private property for private use in violation of the takings clause under article I, section 16 of the Washington Constitution. That clause provides, "Private property shall not be taken for private use, except for private ways of necessity, and for drains, flumes, or ditches on or across the lands of others for agricultural, domestic, or sanitary purposes." CONST. art. I, § 16. But the two cases Pearson relies on, Manufactured Housing Communities and Chong Yim, do not involve a court order related to the use or possession of property to protect a domestic violence victim. See Mfd. Hous. Cmtys. of Wash. v. State, 142 Wn.2d 347, 351, 13 P.3d 183 (2000)[4] (challenge to legislation giving qualified tenants a right of first refusal to purchase a mobile home park), abrogated by Chong Yim v. City of Seattle, 194 Wn.2d 651, 655, 451 P.3d 675 (2019) (challenge to legislation requiring

---

[4] Plurality opinion.

landlords to screen applications in chronological order and offer tenancy to first qualified applicant).

Pearson cites no case in which a court applies the takings clause to the circumstances here. To the contrary, our Supreme Court has observed that a court's equity power "transcends the mechanical application of property rules," including the takings clause. Proctor v. Huntington, 169 Wn.2d 491, 499-01, 238 P.3d 1117 (2010); see also Arnold v. Melani, 75 Wn.2d 143, 151-52, 449 P.2d 800 (1968) (article I, section 16 does not divest the court of equitable powers or bar passage of title under equitable doctrines); cf. Smith v. Smith, 1 Wn. App. 2d 122, 132, 404 P.3d 101 (2017) (DVPO proceedings are equitable in nature). Pearson does not persuade us that the takings clause applies here.

We affirm the DVPO and order to surrender weapons.

Brenner, J

WE CONCUR:

Mann, J.

Dwyer, J.